Lawrence A. BROWN, et al., Plaintiffs,

v.

**KEYSTONE CONSOLIDATED INDUSTRIES, INC., et al.,** Defendants.

No. 86 C 7298.

United States District Court, N.D. Illinois, E.D.

Feb. 10, 1988.

Harold E. Collins, Jonathan P. Geen, Harold E. Collins & Associates, Ltd., Chicago, Ill., for plaintiffs.

Alfred Winchell Whittaker, John M. Walker, Sally Whiteside, Kirkland & Ellis, Chicago, Ill., for Keystone Consol. Industries, Inc.

John P. Morrison, Michael J. Abernathy, Gregory J. Schroedter, Bell, Boyd & Lloyd, Chicago, Ill., for CHS Acquisition Corp. and Frank L. Corral.

## AMENDED MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

The plaintiffs, thirty-five former employees of the Chicago Heights Steel Division ("CHS Division") of Keystone Consolidated Industries, Inc. ("Keystone"), filed this seven count, first amended complaint ("Complaint") against Keystone, CHS Acquisition Corp. ("CHS Acquisition"), Frank L. Corral ("Corral") and the United Steelworkers of America ("Union"), seeking damages for violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. sec. 621 et seq., the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. sec. 1961 et seq., as well as various state

law claims under the doctrine of pendent jurisdiction.

Before the court are Keystone's motion to dismiss the Complaint in its entirety, and CHS Acquisition's and Corral's motion to dismiss certain counts and to strike various allegations in the remaining counts.[1] For the reasons stated below, the defendants' motions are granted in part and denied in part.

## I. FACTS

■ It is axiomatic that "[a] complaint should not be dismissed under Rule 12(b)(6) 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *R.E. Davis Chemical Corporation v. Diasonics, Inc.*, 826 F.2d 678, 684–85 (7th Cir.1987) (*quoting Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957) (footnote omitted)). Accordingly, the plaintiffs' "allegations must be taken as true and must be viewed, along with all reasonable inferences therefrom, in the light most favorable to the plaintiff[s]." *Redfield v. Continental Casualty Co.*, 818 F.2d 596, 605–06 (7th Cir. 1987). This standard also applies to a motion to dismiss under Fed.R.Civ.P. 12(b)(1) for failure to allege sufficiently the existence of subject-matter jurisdiction. *Local 705, International Brotherhood of Teamsters v. Willett, Inc.*, 614 F.Supp. 932, 933 n. 1 (N.D.Ill.1985).

In 1985, Keystone, which owned and operated CHS Division, was experiencing severe financial difficulties, and, as a result, was forced to search for alternative methods by which to pay its debts. Par. 8. Keystone's financial crisis was due in part to the employee benefits it was incurring in its business operations, including CHS Division. CHS Division employees were represented by the Union and were covered by a collective bargaining agreement ("CBA") and pension agreement ("Pension Agreement") which obligated Keystone to provide pension and other employment bene-

---

1. The Union, on May 22, 1987, filed an answer to the plaintiffs' first amended complaint. Therefore, the term "defendants", as used in this opinion, shall not include the Union.

fits that were substantial due to CHS Division's "mature" work force. Par. 9.

As if its financial woes were not problem enough, Keystone was also plagued by problems with the Union, the Internal Revenue Service and the United States Environmental Protection Agency. Pars. 10–11. Given these pressures, Keystone, in order to alleviate its fiscal woes, allegedly conspired with Corral "to circumvent the collective bargaining agreement and pension agreement then in force * * *" by executing a "sham" transaction in which Keystone would sell CHS Division to a purported "independent buyer" (in reality, Corral). Par. 11. In this manner Keystone would continue to realize profits from the operation of the CHS Division business without being saddled with the obligations under the CBA and Pension Agreement.

To this end, on September 20, 1985, Corral, CHS Division's vice president and general manager, as required by the CBA, notified the Union that "consideration is being given to the transfer of ownership of [CHS Division]." Complaint, Ex. C–1. Keystone and Corral also informed CHS Division employees that Keystone "was planning to sell out to an 'independent company' and if all employees did not go along with the planned sale[,CHS Division] would shut down and liquidate * * * [and] that [if they did go along with the sale], all employees who did not retire or take other employment would be hired by" the successor company. Par. 17.

On October 30, 1985, Corral, still vice president and general manager of CHS Division, incorporated CHS Acquisition with capital of only $100. Par. 19. About this same time, Keystone and the Union began negotiating an agreement regarding the effect of the sale of CHS Division on its employees; and on November 14, 1985, the Union and Keystone entered into a shutdown agreement ("Shutdown Agreement") which provided in part that:

(1) CHS Division would be sold to an "independent buyer" (Ex. A, par. 1);

(2) the sale would occur on December 19, 1985 and the plant would shut down at that time (Ex. A, par. 2);

(3) all CHS Division employees would be terminated at 11:00 p.m. on the date of sale (Ex. A, par. 3); and

(4) the CBA between the Union and Keystone would terminate at 11:00 p.m. on the date of the sale (Ex. A, par. 4).

The Shutdown Agreement also set forth the specific effects of the sale on the benefits and pension rights of the CHS Division employees. Ex. A., pars. 5–19.

The following day, November 15, 1985, Corral, once again on behalf of CHS Division, told the Union that Keystone "intends to sell [CHS Division] on or before December 19, 1985." Complaint, Ex. C–3.

CHS Division employees were notified of the terms of the Shutdown Agreement by a letter dated December 16, 1985. Par. 25. This letter, like the previous communications from Keystone and Corral, failed to advise the plaintiffs of the "true" circumstances surrounding the execution of the Shutdown Agreement. Par. 25.

On December 19, 1985, CHS Acquisition purchased the assets of CHS Division from Keystone. Par. 13. At 11:00 p.m. that evening, in accordance with the terms of the Shutdown Agreement, all CHS Division employees, as well as the CBA and Pension Agreement, were terminated. The plaintiffs were not rehired and this suit followed.

## II. DISCUSSION

The defendants move to dismiss the plaintiffs' Complaint on two grounds. First, the defendants argue that all of the plaintiffs' claims, except those under the ADEA, are preempted by federal labor law. Second, they contend that these allegations fail to state a claim upon which relief can be granted. Keystone also asserts that the plaintiffs fail to state a claim under the ADEA. Each of these contentions is addressed below.

### A. *Preemption Under Federal Labor Law*

The defendants argue that the plaintiffs' causes of action for fraudulent misrepresentation, fraudulent conveyance, alter

ego, and intentional interference with contractual relations, as well as their claim under RICO, are preempted by both sec. 301 of the Labor Management Relations Act (the "LMRA") 29 U.S.C. sec. 185, and section 8 of the National Labor Relations Act (the "NLRA"), 29 U.S.C. sec. 158.

■ Section 301 of the LMRA is intended to foster uniformity in the interpretation of labor agreements. Accordingly, sec. 301 preempts state law claims which "are founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective bargaining agreement.'" *Caterpillar Inc. v. Williams*, —— U.S. ——, 107 S.Ct. 2425, 2431, 96 L.Ed.2d 318 (1987), *quoting Electrical Workers v. Hechler*, —— U.S. ——, 107 S.Ct. 2161, 2166–67 n. 3, 95 L.Ed.2d 791 (1987); *see also Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 220, 105 S.Ct. 1904, 1915, 85 L.Ed.2d 206 (1985).

Under the NLRA, on the other hand, a state law claim is preempted if it involves conduct which is actually or arguably protected or prohibited under sections 7 or 8 (*see San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 245–46, 79 S.Ct. 773, 779–80, 3 L.Ed.2d 775 (1959); *Wisconsin Department of Industry v. Gould Inc.*, 475 U.S. 282, 106 S.Ct. 1057, 1061, 89 L.Ed. 2d 223 (1986)), or conduct which, although not actually or arguably protected or prohibited under the NLRA, "Congress intended [to leave] unregulated [and] left 'to be controlled by the free play of economic forces.'" *Machinists v. Wisconsin Employment Relations Commission*, 427 U.S. 132, 140, 96 S.Ct. 2548, 2553, 49 L.Ed.2d 396 (1976), *quoting NLRB v. Nash–Finch Co.*, 404 U.S. 138, 144, 92 S.Ct. 373, 377, 30 L.Ed.2d 328 (1971); *see also Local 926, International Union of Operating Engineers v. Jones*, 460 U.S. 669, 676 n. 8, 103 S.Ct. 1453, 1459 n. 8, 75 L.Ed.2d 368 (1983).

The first prong of preemption under the NLRA, the so-called *Garmon* doctrine, is designed to protect the primary jurisdiction of the NLRB from the federal and state courts, (*Keehr v. Consolidated Freightways*, 825 F.2d 133, 136 (7th Cir.1987); *Lin-gle v. Norge Division of Magic Chef, Inc.*, 823 F.2d 1031, 1042 (7th Cir.1987)), by providing the NLRB with exclusive jurisdiction to determine whether given conduct falls within the NLRA. *See Garmon*, 359 U.S. at 244–45, 79 S.Ct. at 779–80. Nevertheless, *Garmon* recognized that state regulation of conduct arguably within the NLRA was not preempted if the activity regulated is a mere peripheral concern of the labor laws, or if the regulated conduct touches interests so deeply rooted in local feeling that preemption cannot be inferred in the absence of "compelling congressional direction." *Garmon*, 359 U.S. at 243–44, 79 S.Ct. at 778–79.

■ In contrast, federal courts may exercise jurisdiction over claims under sec. 301 of the LMRA even if the conduct is arguably covered by the NLRA. *See, e.g., Serrano v. Jones & Laughlin Steel Co.*, 790 F.2d 1279, 1288 (6th Cir.1986). Section 301 provides that:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce * * * may be brought in any district court of the United States having jurisdiction over the parties * * *.

29 U.S.C. sec. 185(a). In determining whether a claim is preempted by sec. 301, "[t]he ultimate question is whether 'resolution of [the] claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract * * *.'" *Lingle*, 823 F.2d at 1048, *quoting Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 220, 105 S.Ct. 1904, 1916, 85 L.Ed.2d 206 (1985); *see also IBEW v. Hechler*, —— U.S. ——, 107 S.Ct. 2161, 2166, 95 L.Ed.2d 791 (1987) (holding that "an employee's state-tort action that necessarily rests on an interpretation of [the] terms [of the collective bargaining agreement] is pre-empted by sec. 301"). If resolution of a state law tort claim is substantially dependent upon analysis of the terms of a labor agreement, then that claim is "inextricably intertwined with consideration of the terms of the labor contract," and, therefore, preempted. *Lueck*, 471

U.S. at 213, 105 S.Ct. at 1912. We now apply these principles to this case.

### 1. Fraudulent misrepresentation

■ The plaintiffs, in their claim for fraudulent misrepresentation, allege that: When Keystone and the Union entered into the "Shutdown Agreement" on November 14, 1985 * * * the defendants, including Corral, were well aware that said Shutdown Agreement * * * was false and fraudulent in that *inter alia* (a) it and they alleged that "the assets of [CHS Division] would be sold to an independent buyer", (b) it and they failed to disclose that Frank Corral was an officer of both Keystone * * * [and] CHS Acquisition * * * and a director and on information and belief a substantial shareholder of CHS [Acquisition], the alleged independent buyer, (c) it and they failed to advise the plaintiffs that they would not be hired back by the new company because of their age, their prior labor activities and valid workmen's compensation claims that had been previously filed by some of said Plaintiffs, and (d) it and they failed to advise the Plaintiffs that the new corporation would be an empty shell of a company with little or no capital with Keystone financing the transaction and supporting it with a guarantee of continued purchases of fence posts. Par. 300. The plaintiffs also allege that the defendants knew that the Shutdown Agreement was false (par. 301); and that the defendants were obligated, as fiduciaries of the plaintiffs, to disclose any and all material facts relating to the Shutdown Agreement and the sale of CHS Division. Pars. 302, 308.

The plaintiffs' claim for fraudulent misrepresentation clearly centers directly on the terms of the Shutdown Agreement, which is a labor contract. *See* Complaint, Ex. A. In order to determine whether the terms of the Shutdown Agreement are false, we first must know what the terms of the Shutdown Agreement are. This, of course, requires that we analyze those terms. Accordingly, any determination of the plaintiffs' claim for fraudulent misrepresentation "necessarily rests on an interpretation of [the] terms" of the Shutdown Agreement. *Hechler*, 107 S.Ct. at 2166. As such, resolution of this claim is substantially dependent upon, and inextricably intertwined with, the terms of the Shutdown Agreement. It is therefore preempted under sec. 301.

■ We believe that this claim also is preempted by the NLRA. In *Kolentus v. Avco Corp.*, 798 F.2d 949 (7th Cir.1986), former employees filed suit against Avco in federal court alleging that they had been fraudulently deprived of their pension benefits under a collective bargaining agreement and pension agreement where Avco had deliberately withheld certain information from union representatives during labor agreement negotiations. The district court held that the plaintiffs' state law fraud claim was preempted by the NLRA under the *Garmon* doctrine.

On appeal, the Seventh Circuit affirmed the district court's decision, stating that the critical question:

in considering the preemptive effect of the NLRA is whether the controversy presented by the state claim is identical to that which could have been presented to the NLRB. It is only in this situation that litigation of a state claim necessarily involves a risk of interference with the unfair labor practice jurisdiction of the NLRB.

*Id.* at 961. In *Kolentus*, the plaintiffs' fraud claim was preempted by the NLRA because it was "indistinguishable" from the unfair labor practice claim that the plaintiffs could have presented to the NLRB:

In both cases, the key inquiry would be whether, at the time of negotiating and entering into the final collective bargaining and pension agreements, Avco had knowledge of facts indicating that the * * * plant would have to close but withheld this information from the plaintiffs' union representatives.

*Id.*

The Seventh Circuit also held that neither of the exceptions to *Garmon* preemption applied. First, the court held that the

conduct covered by the plaintiffs' fraud claim was not a "mere peripheral concern" under the NLRA; rather, the plaintiffs' claim implicated the employer's duty to bargain in good faith, which is of "central importance" under the NLRA. *Id.; see also H.K. Porter Co., Inc. v. NLRB*, 397 U.S. 99, 103, 90 S.Ct. 821, 823, 25 L.Ed.2d 146 (1970); 29 U.S.C. sec. 158(d).

Similarly, the court rejected the plaintiffs' attempt to frame their fraud claim as one which touched interests so deeply rooted in local feeling that preemption could not be inferred. "While the forum state undoubtedly has an interest in protecting citizens from fraudulent misrepresentations, whether in labor negotiations or not, that interest is outweighed * * * by the NLRB's strong interest in adjudicating this controversy and the danger that the resolution of the dispute under state law and under the NLRA might differ." *Id.*

We believe *Kolentus* governs the plaintiffs' fraud claim. Here, the plaintiffs allege that the defendants fraudulently withheld information from them[2] while negotiating the Shutdown Agreement and during the subsequent sale of CHS Division. Essentially, then, the plaintiffs contend that the defendants did not bargain in good faith, a duty at the heart of the NLRA. Furthermore, the plaintiffs' common law fraud claim is identical to the unfair labor practice claim that they could have presented to the NLRB: in both cases, the "key inquiry" would be whether the defendants possessed and withheld knowledge of facts indicating that: CHS Acquisition was not an independent buyer; Corral was the alleged independent buyer; the plaintiffs would not be rehired because of their respective ages and prior labor activities; and, CHS Acquisition was a shell corporation used by Keystone in order to avoid its obligations under the CBA and Pension Agreement.

For the reasons set forth in *Kolentus*, we also hold that neither of the exceptions to *Garmon* preemption is available to the plaintiffs. Accordingly, we hold that the plaintiffs' state law fraud claim is preempted by both sec. 301 and the NLRA.

### 2. Fraudulent conveyance

■ In their claim for fraudulent conveyance, the plaintiffs allege that, on November 14, 1985, the execution date of the Shutdown Agreement, they were "preexisting creditors" of Keystone in that "[Keystone] owed the plaintiffs substantial sums of money in the form of pension and retirement benefits and contractual obligations under their [CBA]. * * * [T]he conveyance of the assets of Keystone to CHS [Acquisition] was a false and fraudulent conveyance entered into by those parties for the purpose of avoiding the claims of the plaintiffs * * *." Par. 404.

This cause of action, like the claim for common law fraud, is preempted by both the LMRA and the NLRA. As the plaintiffs' allegations concede, they are only "preexisting creditors" of Keystone to the extent that Keystone owes them monies under the terms of the CBA and Pension Agreement. Indeed, the Shutdown Agreement also directly addresses the plaintiffs' eligibility for these benefits. Thus, it would be necessary to analyze the terms of at least *three* labor agreements in order to resolve the plaintiffs' fraudulent conveyance claim. Obviously, then, this cause of action is preempted by sec. 301.

The plaintiffs, in response, do not even address the issue of preemption under sec. 301. *See* Pls.' Resp. at 10. They do argue,

---

**2.** Although in *Kolentus* the employer withheld the information from the plaintiffs' *union representatives,* and here the employer and the union withheld information from the *employees,* we do not believe it affects our conclusion that the plaintiffs' claims are preempted by the NLRA. Indeed, the plaintiffs have not satisfactorily identified the source of the defendants' (except the Union's) "fiduciary" duty to disclose information to them during the bargaining process.

Under the NLRA an employer may not bargain with its employees; the union is the exclusive bargaining representative of the unit employees. 29 U.S.C. sec. 159(a). Nevertheless, since we conclude that this state law claim is preempted by both sec. 301 and the NLRA, we do not pursue this issue. We will assume for purposes of this motion that Keystone and Corral were "fiduciaries" of the plaintiffs and did owe a duty of disclosure to them.

however, that this claim is not preempted by the NLRA:

> because Plaintiffs are asserting their rights in said court, not in their capacity as former employees of the defendant, but rather as creditors of the defendant. Any creditor is entitled to bring a cause of action for fraudulent conveyance and the labor laws are in no way designed to or intended as protection for creditor rights.

*Id.* This reasoning, however, hopelessly misconceives the nature of preemption under the *Garmon* doctrine: the preemptive scope of the NLRA focuses on the *conduct* sought to be regulated, and not that a given label can be placed upon parties who clearly are subject to the NLRA's strictures.

In this case, the plaintiffs allege that the sale of Keystone's CHS Division assets to CHS Acquisition constituted a fraudulent conveyance because it deprived the plaintiffs of certain monies owed them under various labor agreements as *CHS Division employees.* Whatever else may be said about this conduct, it is arguably prohibited under sec. 8 of the NLRA, (*see* 29 U.S.C. sec. 158), and it is certainly preempted.

### 3. Intentional interference with contractual relations

■ The plaintiffs also allege that Corral and CHS Acquisition intentionally induced Keystone to breach and terminate the CBA and Pension Agreement with the Union. Par. 500.[3] This claim, unlike plaintiffs' claims for fraudulent misrepresentation and fraudulent conveyance, presents a difficult preemption issue. Essentially, the plaintiffs contend that this cause of action is not preempted by sec. 301 because CHS Acquisition and Corral are *non-signatories* to the CBA and Pension Agreement. The issue of whether a claim for intentional interference with contractual relations is preempted by sec. 301 has given rise to some disagreement.

In *Dougherty v. Parsec, Inc.,* 824 F.2d 1477 (6th Cir.1987), the plaintiff alleged that Seaboard System Railroad ("SSR"), induced his employer, Parsec, to discharge him, thus interfering with his contractual relationship with Parsec. SSR countered by arguing that the plaintiff's cause of action was preempted by sec. 301. The district court agreed with SSR. The Sixth Circuit, in a divided opinion, affirmed:

> [r]egardless of how the tortious interference with contract claim is defined, the terms of the labor agreement will have to be scrutinized to determine if [SSR] induced its breach. * * * The only contract with which any interference could be charged is the collective bargaining agreement. An interference claim could not exist in the absence of such agreement, which in turn is exclusively to be determined under federal law.

*Id.* at 1478 (quotation marks omitted).

The dissent, authored by Judge Gilmore, reasoned that the plaintiff's claim was not preempted because it would not allow state law "to define the meaning of the contractual relationship * * *." *Id.* at 1482. Specifically, since the defendants were not signatories to the labor agreement, any decision by the court, even if it required interpretation of the labor agreement, would not modify the relationship *between the parties* because the rights and duties of the non-signatory were not stated in the labor contract.

---

**3.** CHS Acquisition and Corral also contend that the plaintiffs lack standing to bring this action since the plaintiffs were not parties to the CBA and Pension Agreement. This reasoning is unpersuasive. The plaintiffs are third-party beneficiaries to these agreements, (*See, e.g., IBEW v. Hechler,* —— U.S. ——, 107 S.Ct. 2161, 2169–70 n. 7, 95 L.Ed.2d 791 (1987)), and, as such, have standing to sue under sec. 301. *Id.; see also Smith v. Evening News Association,* 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). These same principles would provide the plaintiffs with standing to sue under their state law tort claim for interference with contractual relations. Under Illinois law, an individual is a "third party beneficiary" to a contract if the parties to the contract intended that the contract confer a benefit on him, (*Bates & Rogers Construction Corp. v. Greeley & Hansen,* 109 Ill.2d 225, 93 Ill.Dec. 369, 373, 486 N.E.2d 902, 906 (1985)), and may maintain suit for breach of a contract. *Smith v. Clark Equipment Co.,* 136 Ill.App.3d 800, 91 Ill.Dec. 520, 523, 483 N.E.2d 1006, 1009 (1st Dist.1985).

The dissent also observed that the policy considerations underlying the preemptive reach of sec. 301 (namely, to avoid uncertainty in labor contract interpretation and to encourage arbitration of labor contract disputes) were not applicable in a situation involving a non-signatory.[4] Finally, the dissent noted that if, on the one hand, a court lacked subject matter jurisdiction over a claim involving a non-signatory under sec. 301, and, on the other hand, such claims are preempted by sec. 301, it would in effect give an interfering third-party immunity.

Notwithstanding this powerful dissent, we believe that the better reasoned result was reached by the *Dougherty* majority. In order to prevail on their claim for intentional interference with contractual relations, under Illinois law, the plaintiffs must establish that the CBA and Pension Agreement were breached. *See Salaymeh v. Interqual, Inc.*, 155 Ill.App.3d 1040, 108 Ill.Dec. 578, 582, 508 N.E.2d 1155, 1159 (5th Dist.1987). This determination, in turn, necessarily requires that we analyze the terms of the CBA and Pension Agreement to resolve the state law claim. This, of course, is the precise danger that *Lueck* and its progeny have stressed repeatedly in the context of sec. 301 preemption.

Furthermore, we believe that each of the reasons posited by the *Dougherty* dissent for concluding otherwise, under thorough analysis, fails to bear the heavy weight placed upon it. First, we respectfully disagree with the dissent's reasoning that resolution of a state tort claim involving a nonsignatory to a labor contract, which necessitated interpretation of that contract, would not modify the relationship between the parties to the contract. Both *Caterpillar, Inc. v. Williams*, — U.S. —, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987), and *IBEW v. Hechler*, — U.S. —, 107 S.Ct. 2161, 95 L.Ed.2d 791 (1987), support our conclusion. *Caterpillar* held, *inter alia,* that sec. 301 "governs claims founded di-

rectly on rights created by collective bargaining agreements, and also claims 'substantially dependent on analysis of a collective bargaining agreement.'" *Id.* 107 S.Ct., at 2431. *Hechler*, relying on *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), held that a state law tort claim is preempted by sec. 301 if liability will be determined by "questions of contract interpretation * * *." *Hechler*, 107 S.Ct. at 2168, *quoting Lueck*, 471 U.S. at 218, 105 S.Ct. at 1915.

In this case, the rights upon which the plaintiffs bring this claim are created *exclusively* by the CBA and Pension Agreement. Any determination of tort liability for contractual interference necessarily will require us to analyze the terms of these agreements to determine if they were breached. The state law tort claim is thus substantially dependent on an analysis of these agreements, and therefore it is preempted. Moreover, our conclusion is consistent with the policies underlying sec. 301. If state courts were allowed to interpret labor agreements, even in the context of state law tort claims involving non-signatories to such agreements, there would be a substantial possibility that their interpretations would be inconsistent with those given by the federal courts. This, in turn, would produce uncertainty and generate instability in the negotiation and administration of labor agreements, which is the very result the Court has emphasized must be avoided.

Thus, although the Court has recognized that "it would be inconsistent with congressional intent under [sec. 301] to preempt state rules that proscribe conduct, or establish rights and obligations, *independent* of a labor contract", (*Lueck*, 471 U.S. at 212, 105 S.Ct. at 1912 (emphasis supplied); *see also Caterpillar*, 107 S.Ct. at 2431; *Hechler*, 107 S.Ct. at 2166–67 n. 3.), the plaintiffs' claim clearly does not fall within this narrow exception.

---

**4.** According to the dissent, these policies were inapplicable because, as noted above, resolution of this claim would not involve interpretation of the labor contract as it affected the relationship

*between the parties;* and second, a non-signatory to a labor agreement cannot be forced to arbitrate even though the labor agreement provides for mandatory arbitration. *Id.* at 1482–83.

In so holding, we are aware that our Court of Appeals has previously indicated that a claim for tortious interference with contractual relations might not be preempted by sec. 301. In *Loss v. Blankenship*, 673 F.2d 942 (7th Cir.1982), the Seventh Circuit noted that:

> We fail to see * * * in what way the need for uniformity dictates a holding that tortious interference with contract is actionable under sec. 301. The [*Local 174, Teamsters v.*] *Lucas Flour* Court based its decision on the fact that, if collective bargaining agreements were construed differently under state and federal law, "neither *party* could be certain of the rights which it had obtained or conceded." [369 U.S. 95] at 103, 82 S.Ct. [571] at 576 [7 L.Ed.2d 593 (1962)] (emphasis added). Requiring suits against non-parties for tortious interference with contract to be brought under state law, however, will not "exert a disruptive influence upon both the negotiation and administration of collective agreements." *Id.* Parties to the collective bargaining agreement will still be able to have their respective obligations to one another determined by federal law.

*Id.* at 948 n. 6. The *Loss* Court, however, in framing these dicta, which were submerged in a footnote, lacked the guidance of the Supreme Court's subsequent decisions in *Lueck, Caterpillar,* and *Hechler,* all of which require that a sec. 301 preemption inquiry focus on whether the terms of a labor contract must be analyzed in order to resolve the state law claim, and not whether the parties to the state law claim are the same parties to the labor agreement.[5]

Although the Seventh Circuit has had the opportunity to consider these decisions (see *Lingle*), it has not yet addressed the precise issue presented here and which was only tangentially noted in *Loss.* Since we do not believe that the *Loss* dicta accurately reflect the law after *Lueck,* we respect-fully decline to adopt *Loss* as controlling in this case.

Finally, we are aware of the fact that the conclusion we reach effectively precludes a party from suing a non-signatory to a labor agreement for any claim which is preempted by sec. 301. This unfortunate result notwithstanding, we are obligated to give effect to congressional intent in enacting sec. 301. *See Lueck,* 471 U.S. at 208, 105 S.Ct. at 1909. The fact that the plaintiffs cannot prevail in a sec. 301 claim against non-signatories to a labor agreement for claims that are substantially dependent on the terms of the labor agreement does not empower this court to legislate an exception to its preemptive effect. We are simply not in the legislation business. If the plaintiffs desire a change in the law, they must address the Congress, and not the federal court.

 The issue of whether the plaintiffs' claim for intentional interference with contractual relations is preempted by the NLRA also is not without its problems. The unfair labor practices provisions of the NLRA "regulate the conduct of employers and labor organizations only * * *." *Local 1814, International Longshoremen's Association v. NLRB,* 735 F.2d 1384, 1393 (D.C.Cir.1984); 29 U.S.C. sec. 158(a), (b). Therefore, unless the party against whom an unfair labor practice claim is asserted is an "employer" or "labor organization" within the meaning of the NLRA, it would appear to follow that the conduct which gives rise to the claim cannot even "arguably" be prohibited under the NLRA. Thus *Garmon* preemption would not apply, and the plaintiffs would be free to pursue their cause of action in state or federal court. But things are not that simple.

Section 10(a) of the NLRA (codified at 29 U.S.C. sec. 160(a)), provides that the NLRB "is empowered * * * to prevent any *person* from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce." (Emphasis supplied.) Under the NLRA, a "person" is

5. Indeed, in *Lueck,* the Court held that sec. 301 preempted any claim which required interpretation of even a contract phrase or term of a labor contract. *Lueck,* 471 U.S. at 211, 105 S.Ct. at 1911.

defined as "one or more individuals, labor organizations, partnerships, associations, corporations, legal representatives, trustees, trustees in bankruptcy, or receivers." 29 U.S.C. sec. 152(1). Section 10(a) suggests that entities other than employers and labor organizations may engage in unfair labor practices. If so, then conduct may be "arguably prohibited" under the NLRA even though it is neither an employer nor a labor organization which engages in it, and the preemptive reach of the NLRA would not be circumscribed to suits in which the defendant is an employer or a labor organization.

The latter position finds support in *Lumber Production Industrial Workers v. West Coast Industrial Relations Association, Inc.*, 775 F.2d 1042 (9th Cir.1985). In *West Coast*, the plaintiff, a union, alleged that certain labor consultants whom the employer had hired to negotiate a collective bargaining agreement with the union had maliciously interfered with the union's prospective contractual relationship with the employer. The defendants contended that this claim was preempted by the NLRA. The union disagreed (apparently) arguing that the labor consultants were acting as independent third parties when they tortiously induced the termination of the prospective contractual relationship, that is, the labor consultants could be sued under state law because they were not employers within the meaning of sec. 158.

The Ninth Circuit rejected the union's argument and held that the claim was preempted.

Even if we accept the union's argument that the labor consultants were not [the employer's] agents at the time the tort was committed, the fact remains that the conduct which constitutes an essential element of the union's state law action [ (namely, that the labor consultants' conduct caused the termination of the collective bargaining relationship between the employer and the union) ] is the very same conduct that the Board considered in rejecting the union's unfair labor practice claims. The Supreme Court stated in [*Local 926, International Union of Operating Engineers v.*] *Jones*[, 460 U.S. 669, 103 S.Ct. 1453, 75 L.Ed.2d 368 (1983),] that if the conduct relied on to prove a crucial element in the state action is conduct that is arguably covered by the NLRA, then the state claim is preempted.

*Id.* at 1049. Although the Ninth Circuit's reliance on *Jones* is open to question (in that the defendant in *Jones* was a *labor organization,* and therefore clearly covered under sec. 158(b)),[6] we conclude that its result was sound. In this case, the centerpiece of the plaintiffs' claim is that CHS Acquisition and Corral induced Keystone to breach its labor agreements with the Union, which, as in *West Coast*, is the same conduct which would form the core of an unfair labor practice presented to the NLRB.[7] Therefore, the plaintiffs' claim for intentional interference with contractual relations also is preempted by the

---

6. Similarly, we find the only other cases that CHS Acquisition and Corral cite for support, *Mobile Mechanical Contractors Ass'n. v. Carlough*, 664 F.2d 481 (5th Cir.1981), *Local 207 v. Perko*, 373 U.S. 701, 83 S.Ct. 1429, 10 L.Ed.2d 646 (1963) also involve labor organization defendants, and are of little help here. *See also Gray v. Local 714*, 778 F.2d 1087 (5th Cir.1985) (employer and labor organization defendants); *Falls Stamping and Welding Co. v. International Union, UAW*, 744 F.2d 521 (6th Cir.1984) (labor organization defendants); *In re Sewell*, 690 F.2d 403 (4th Cir.1982) (employer defendant seeking writ of mandamus); *Park Electric Co. v. International Brotherhood of Electrical Workers*, 540 F.Supp. 779 (N.D.Ill.1982) (labor organization defendants); *Billy Jack For Her, Inc. v. New York Coat, Suit*, 511 F.Supp. 1180 (S.D.N.Y. 1981) (labor organization defendant).

7. We also note that if the plaintiffs were successful in proving that CHS Acquisition is the alter ego of Keystone (*see* sec. 4, immediately below), they also would succeed in extinguishing their claim for intentional interference with contractual relations: under Illinois law a party cannot be sued in tort for intentionally inducing the breach of his own contract. *See Allen Saltzman Associates, Inc. v. Aileen, Inc.*, 633 F.Supp. 1161, 1163 (N.D.Ill.1986). Nor can a corporate officer (such as Corral) generally be held liable for tortiously interfering with one of the corporation's contracts. *See George A. Fuller Co. v. Chicago College of Osteopathic Medicine*, 719 F.2d 1326, 1333 (7th Cir.1983).

**1224**

NLRA.[8]

**4. Alter ego**

◼ The plaintiffs unquestionably have pleaded adequately the existence of an alter ego relationship between CHS Acquisition and Keystone. *See* Complaint, pars. 207–219; *see also Adams & Westlake, Ltd. v. NLRB*, 814 F.2d 1161, 1164 n. 1 (7th Cir.1987) (listing factors in alter ego analysis). CHS Acquisition does not argue that this court lacks jurisdiction under sec. 301 because it is a non-signatory to the CBA and Pension Agreement. It would not help if it did. *See Local 705 v. Willett, Inc.*, 614 F.Supp. 932, 939 (N.D.Ill.1985) (citations omitted).

CHS Acquisition does argue, however, that the alter ego claim is preempted by sec. 301 to the extent that it requires us to analyze the terms of the Shutdown Agreement. CHS Acquisition and Corral Memorandum at 19. We agree. In Count IV, the plaintiffs allege that Keystone defrauded and used economic duress to deprive the plaintiffs "of their employment and pension rights." Par. 219. Assuming that this allegation is true, its resolution necessarily depends upon analysis of the CBA and Pension Agreement: we must initially determine that the plaintiffs *have* employment and pension rights under the CBA and Pension Agreement before we can determine that they have been deprived of such rights.

◼ The alter ego claim also is preempted by the NLRA. In order for the plaintiffs to receive the relief which they have requested against CHS Acquisition and Corral, they must prove two facts: first, that CHS Acquisition (and Corral, as its owner) is the alter ego of Keystone; and second, that Keystone has engaged in

unlawful conduct giving rise to a cause of action for which the plaintiffs may seek relief. Here, the plaintiffs contend that the defendants, by fraudulently negotiating the Shutdown Agreement and selling CHS Division's assets, have defrauded them out of their rights and benefits as Keystone employees. The loss of these benefits, moreover, is intimately bound up with the terms of the Shutdown Agreement, which was negotiated around the allegedly fraudulent sale. The underlying conduct is arguably within the prohibited activities of the NLRA. The plaintiffs do not contend that either of the *Garmon* exceptions apply, and we believe they were correct in so refraining.

**5. RICO**

◼ For the reasons we have spelled out in detail in secs. A(1) through (4) above, we also find that the plaintiffs' RICO claim is preempted by sec. 301. In order to state a cause of action under RICO, a plaintiff must plead and prove that the defendants have engaged in a pattern of racketeering activity. A pattern of racketeering activity consists of the commission of at least two predicate acts within a ten year period. *See Tellis v. United States Fidelity & Guaranty Co.*, 826 F.2d 477, 478 (7th Cir.1987). In this case, the underlying conduct which forms the nucleus of the plaintiffs' RICO claim is that the defendants have fraudulently deprived them of their employment benefits, which, we repeat, requires us to analyze the terms of the CBA, Pension Agreement and Shutdown Agreement.

◼ Because the same underlying conduct constitutes an unfair labor practice under the NLRA, it is preempted by that

8. Furthermore, the plaintiffs' reliance on *Belknap, Inc. v. Hale*, 463 U.S. 491, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983), is misplaced. In *Belknap*, the Court held that replacement workers for striking union employees could bring an action against their employer, Belknap, for breach of contract and fraudulent misrepresentation. The Court's conclusion, however, was based on the fact that unfair labor practice action by the union against Belknap would focus on the rights of striking employees; on the other hand,

the replacement workers' suit would have nothing in common with the union's unfair labor claim. In short, the suit that could have been presented to the NLRB was not identical to the plaintiffs' state law claims.

In this case, as in *West Coast,* the focus of both suits would be identical. In both cases the plaintiffs would have to establish that Corral and CHS Acquisition caused the termination of the collective bargaining relationship between the Union and Keystone.

statute also. The plaintiffs, relying on *Butchers' Union Local No. 498 v. SDC Investment, Inc.*, 631 F.Supp. 1001 (E.D. Cal.1986), argue that their RICO claim is not preempted by the NLRA. As we make clear below, however, the plaintiffs' reliance on *SDC* is misplaced.

In *SDC*, the plaintiffs, various labor organizations and two employees, filed a civil RICO action against SDC as well as other defendants alleging that the defendants made certain payments to a labor organization in violation of various federal labor laws, including 29 U.S.C. sec. 186 (sec. 302 of the LMRA), and also by utilizing the mails and wires in order to carry out their fraudulent scheme. The defendants moved to dismiss the plaintiffs' entire complaint as being preempted by the NLRA. The court held that the RICO claims based upon violations of sec. 186 of the LMRA were not preempted, but that the claims predicated on wire and mail fraud were preempted.

In holding that the sec. 186 claims were not preempted, the court noted that violations of sec. 186 were expressly referenced as predicate acts under RICO. Accordingly, the court reasoned Congress did not intend to preempt claims based upon violations of sec. 186:

> [I]t is hard to imagine that Congress would have made sec. 186 a RICO predicate act without the intention of making violations of sec. 186, which necessarily arise in the labor context, the basis of a RICO action brought in the district court.

631 F.Supp. at 1007.

The court distinguished, however, the plaintiffs' sec. 186 violations, which are specifically referenced in RICO, from the mail and wire fraud claims which are "generic statutes":

> RICO's reference to [mail fraud and wire fraud] cannot be said to speak, by its terms, to the question of labor law preemption. Moreover, the inclusion of sec.

186 violations as predicate acts suggests that Congress was being selective as to what activities were being removed from the ambit of the exclusive jurisdiction of the labor law. The violation of no other labor statutes constitutes a RICO predicate act.

*Id.* at 1009. The court then held that the plaintiffs' mail and wire fraud claims were preempted for two reasons: first, since the plaintiff sought to prove conduct which fell under the exclusive jurisdiction of the NLRB, it was preempted under the general rule enunciated in *Garmon. Id.* at 1010. Second, the court found that "*but for* the proscriptions of the labor law, defendants' conduct simply would not be either mail or wire fraud." *Id.* at 1011. The only reason that the defendants had committed predicate acts under 18 U.S.C. secs. 1341 and 1343 was that they used the mails and wires in furtherance of fraud as defined by federal labor law.

> In this case, the plaintiffs allege that: [T]he Defendants have in concert, agreement and conspiracy with each other conceived, implemented and accomplished a scheme to deceive and defraud the Plaintiffs into giving up their employment, pension, benefits and seniority rights as employees of Keystone's [CHS] Division in order that CHS [Acquisition] and Corral * * * could directly and indirectly acquire and maintain control over and an interest in the business and assets of Keystone's [CHS] Division.

Par. 172. The underlying fraudulent scheme, then, is the defendants' attempt to defraud the plaintiffs out of employment benefits. Paragraph 174 alleges that the defendants committed the following predicate acts: (a) mail fraud relating to the sale of CHS Division assets; (b) wire fraud—same; (c) economic duress and extortion [9]—same; and (d) filing a deceptive and misleading 10K Form with the Securities

---

**9.** There are no allegations in the plaintiffs' Complaint which (even inferentially) warrant the conclusion that the defendants have committed extortion, as that offense is defined under federal law (*see* 18 U.S.C. sec. 1751(b)(2)), or the crime of "intimidation" as defined by Illinois

law. *See* Ill.Rev.Stat.1979, ch. 38, par. 12–6. The inclusion of "economic duress" is bewildering inasmuch as there is absolutely no indication in the plain language of RICO that it is a predicate act.

Exchange Commission.[10] Only the mail and wire fraud claims are pleaded sufficiently as predicate acts within the meaning of sec. 1961, but they are both generic. As such, we must look to the underlying fraud which makes the use of the mails and wires actionable. In this case, as in *SDC*, the underlying conduct is wrongful only by virtue of the labor laws. Therefore, the RICO claim is preempted.[11] *See Chicago District Council of Carpenters Pension Fund v. Juell*, slip op. No. 84 C 7467 (N.D.Ill. June 30, 1987) (Holderman, J.) [Available on WESTLAW, 1987 WL 13667].

Having determined that all of the foregoing claims are preempted by both the LMRA and the NLRA, we must now decide the proper disposition of these claims. That is, since we possess jurisdiction over claims arising under the LMRA, but lack jurisdiction over claims preempted by the NLRA, we must decide whether our exercise of jurisdiction in this case would be appropriate. Although a court is not deprived of jurisdiction under sec. 301 simply because the activity also constitutes an unfair labor practice, (*see William E. Arnold Co. v. Carpenters District Council*, 417 U.S. 12, 15–16, 94 S.Ct. 2069, 2071–2072, 40 L.Ed.2d 620 (1974); *Smith v. Evening News Association*, 371 U.S. 195, 197, 83 S.Ct. 267, 268, 9 L.Ed.2d 246 (1962)), courts nevertheless have declined to exercise such jurisdiction over representational matters which have been "almost invariably processed administratively through the NLRB under section 9 of the [NLRA] * * *." *Local Union 204 v. Iowa Electric*, 668 F.2d 413, 416 (8th Cir.1982). Thus:

> there is a critical difference between an unfair labor practice charge and the basic policy of the [NLRA] vesting primary (if not exclusive) jurisdiction in the NLRB in two decisive areas of labor-

management relations: (1) the designation of an exclusive bargaining agent, and (2) identification of an appropriate collective bargaining unit under Section 9 of the [NLRA].

*Local 3–193, International Woodworkers v. Ketchikan Pulp Co.*, 611 F.2d 1295, 1298 (9th Cir.1980); *see also Local 705, International Brotherhood of Teamsters v. Willett, Inc.*, 614 F.Supp. 932, 935–36 (N.D.Ill. 1985).

▮ *Ketchikan* and *Willett* teach that in determining whether jurisdiction may be exercised properly under sec. 301, we must decide whether the major issues in the case are primarily representational or primarily contractual. *Iowa Electric*, 668 F.2d at 419. In this case, there is no dispute regarding the designation of the exclusive bargaining agent (the Union) or with identifying the appropriate collective bargaining unit (Keystone). The plaintiffs do allege, however, that they have been unlawfully deprived of their rights under the CBA and Pension Agreement. As we have stressed time and time again throughout this opinion, resolution of the plaintiffs' claims necessarily depends upon analysis of the terms of the CBA and Shutdown Agreement. We hold, therefore, that the major issues presented in this case are not primarily representational; rather, they are primarily contractual. Accordingly, our exercise of jurisdiction under sec. 301 is appropriate.

▮ The defendants argue alternatively that any claim under sec. 301 is barred by the six-month statute of limitations applicable to "hybrid" actions by employees against a union and an employer. *See Del Costello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct.

---

**10.** It is true that a federal court has independent subject matter jurisdiction over violations of the Securities Exchange Act. Presumably the plaintiffs rely on 18 U.S.C. sec. 1961(1)(D) which provides that "fraud in the sale of securities" constitutes a predicate act of racketeering. This reliance is misplaced. The plaintiffs cannot allege that this fraud occurred in the *"sale* of securities" because the 10K was not filed until September 29, 1986, more than 9 months after CHS Acquisition purchased CHS Division.

**11.** In any event, we think it is clear that the plaintiffs' RICO claim also fails to allege adequately the existence of a "pattern" of racketeering activity in that there is only one transaction involved here which occurred over a three-month period: namely, the breach of contract which has deprived the plaintiffs of their employment and benefits.

2281, 76 L.Ed.2d 476 (1983); *see also Niro v. Fearn International, Inc.*, 827 F.2d 173, 177 (7th Cir.1987). The defendants contend that the "latest time at which plaintiffs' cause of action 'accrued' is December 16, 1985", when the plaintiffs were advised of the terms of the Shutdown Agreement. Keystone's Mem. at 31. Since this suit was not filed until some nine months later, on September 25, 1986, the defendants continue, it is barred by the statute of limitations.

The plaintiffs counter by arguing that the defendants have misstated the date upon which their claim began to accrue, because the six month limitation period was equitably tolled by the defendants' fraudulent concealment of their wrongdoing. The plaintiffs contend that, as a result of the defendants' fraudulent conduct, they were neither aware nor should have been aware that they had a cause of action for alter ego and other related claims until January of 1987 (necessitating the first amended complaint), well within the six-month limitations period.

The defendants reply that the plaintiffs, in the exercise of due diligence, should "have 'uncovered' the 'concealed' matter more than six months before they filed their Complaint." Keystone's Reply at 11. The plaintiffs have the better of this argument. Whether the plaintiffs exercised due diligence in rooting out the defendants' alleged unlawful activities is simply not a matter that is properly decided on the pleadings before us.[12]

We nevertheless believe that the plaintiffs' sec. 301 claim is time barred. On June 4, 1986, the plaintiffs' attorney, Harold E. Collins, attempted to file unfair labor practice charges with the NLRB, but the NLRB refused to accept the charges because the plaintiffs' only cause of action was one for age discrimination.[13] Plaintiffs' App., Ex. D., par. 3. Shortly thereafter, on June 13, 1986, the plaintiffs filed charges of age discrimination against the Union, CHS Acquisition, and Keystone with the Equal Employment Opportunity Commission. After waiting the required 60 days, on September 25, 1986, the plaintiffs filed this suit alleging, *inter alia*, the Union "conspir[ed] with CHS [Acquisition] and Keystone to terminate th[e plaintiffs] because of their age." *Id.* at par. 4.

From these facts it is clear that the plaintiffs believed, as early as June 4, 1986, that the defendants had committed unfair labor practices which would entitle the plaintiffs to recover under the federal labor laws. In essence, the plaintiffs believed that they had been illegally discharged. Not only would such discharges constitute violations of the ADEA, they would also constitute violations of the CBA (*see* Defs.' App., Ex. Art. 8, sec. 1) giving rise to a sec. 301 claim. The plaintiffs, however, did not file a sec. 301 action alleging breach of the CBA. Rather, they only alleged violations of the ADEA. They had until December 4, 1986 within which to file their sec. 301 claim, but they did not do so. Accordingly, the plaintiffs' sec. 301 claim is barred by the statute of limitations.

**B.** *Motion to Dismiss the Plaintiffs' ADEA Claims* [14]

Keystone argues that the plaintiffs fail to state a claim under the ADEA against Keystone for three reasons: first, Keystone asserts that the plaintiffs "concede that they would have been terminated *regardless* of age * * *", and therefore they have not pleaded that age was a determining factor in their terminations. Key-

---

**12.** We treat this aspect of the defendants' motion as a converted motion for summary judgment pursuant to Fed.R.Civ.P. 12(b) because the CBA and other materials are not attached to the plaintiffs' Complaint, and therefore properly cannot be considered on a motion under Rule 12(b)(6).

**13.** The filing of unfair labor practice charges with the NLRB does not toll or prevent the accrual of a sec. 301 cause of action. *Adkins v. International Union of Electrical, Radio & Ma-*

*chine Workers,* 769 F.2d 330, 335 (6th Cir.1985) (collecting cases); *Anderson v. Amalgamated Transit Union,* 626 F.Supp. 378, 379 (N.D.Ill. 1986).

**14.** At the time the plaintiffs were terminated, Johnny Carr was not a member of the protected age group (40–70) under the ADEA, and therefore he is not a plaintiff in either Count I or Count II.

stone Mem. at 14 (emphasis in original). Second, Keystone argues that at the time CHS Acquisition decided to forego rehiring the plaintiffs, Keystone was no longer the plaintiffs' "employer." Finally, Keystone contends that the plaintiffs have failed to plead sufficiently the existence of a conspiracy among the defendants. We reject each of these objections.

First, nowhere in their Complaint do the plaintiffs "concede" that they would have been terminated regardless of age. Keystone cites par. 15 of the Complaint as comprehending this concession. Paragraph 15 provides that:

> The purpose of the Keystone CHS [Acquisition] transaction was and [sic] the defendants intended thereby to circumvent Keystone's [obligations under the CBA and Pension Agreement], so as to allow operations to continue at that plant on a more profitable basis with greatly reduced wages, pension and employee benefit expenses, and with the elimination of seniority and work rules that Keystone perceived to be burdensome. A further purpose of the transaction was to assure Keystone that it or one or more of its affiliated companies would be beneficiaries of these increased profits while assuring it that there would be no interruption in its continuing purchase of a supply of fence posts and other products manufactured by CHS [Acquisition] at prices effectively controlled by Keystone.

These allegations, contrary to Keystone's reading, do not "concede" that the plaintiffs would have been terminated regardless of age. It is true that one *could*

conclude from these allegations, inferentially, that the plaintiffs would have been terminated irrespective of age. We, however, cannot make inferences in the defendants' favor on a motion to dismiss, and therefore we reject Keystone's argument.

Keystone's second objection, namely, that it was not an employer within the meaning of the ADEA when the employment decisions affecting the plaintiffs were made, is somewhat more persuasive. Since the plaintiffs were terminated after the sale, Keystone argues that CHS Acquisition, and not Keystone, made the decision to refuse to rehire the plaintiffs; and, as a result, Keystone may not be held liable.[15] This argument, although possessing some force, is vitiated by the plaintiffs' allegations of conspiracy. If in fact Keystone conspired with the other defendants to deprive the plaintiffs of their employment because of their age, then *Keystone* will be liable. This leads us to Keystone's third and final objection, namely, that the plaintiffs have not adequately pleaded the existence of a conspiracy among the defendants. "A civil conspiracy is an agreement [between] two or more people to commit an unlawful act, or to inflict a wrong against another, and an overt act that results in damages." *Old Security Life Insurance Co. v. Continental Illinois National Bank,* 740 F.2d 1384, 1397 (7th Cir.1984). We believe that the plaintiffs adequately have alleged the existence of a conspiracy. *See* Complaint, pars. 11–30. Accordingly, Keystone's motion to dismiss Counts I and II of the plaintiffs' Complaint is denied.[16]

---

**15.** We note that this objection could easily be overcome by including allegations of an alter ego relationship between Keystone and CHS Acquisition within the four corners of Counts I and II: if CHS Acquisition was Keystone's alter ego, then any employment decision made by CHS Acquisition also would be Keystone's decision. It follows, of necessity, then, that Keystone was still the plaintiffs' "employer" when the terminations occurred, and would be a proper defendant to both Count I and Count II.

**16.** We similarly reject Keystone's argument that because its termination of *all* CHS Division employees on December 19, 1985 was "even-handed", it cannot be held liable. If Keystone conspired with the other defendants to deprive the

plaintiffs of their employment because of age, by refusing to *rehire* them, it makes little difference whether Keystone's initial decision to terminate all of its CHS Division employees was not itself discriminatory. Indeed, Keystone's initial termination of its CHS Division employees could have been an important step to achieving the conspirators' ultimate objective: by terminating all of its employees in one fell swoop, Keystone might very well have attempted to gain the appearance of "even-handedness." Having done so, Keystone and CHS Acquisition could then implement their unlawful conspiracy by refusing to rehire employees who were within the protected age group.

### III. CONCLUSION

For reasons set forth above, we conclude that:

(1) the plaintiffs' state law and RICO claims are preempted by both the NLRA and sec. 301; and

(2) the issues presented by the plaintiffs' section 301 claim are primarily contractual, not representational, and thus our exercise of jurisdiction is appropriate.

It is therefore ordered that:

(1) the defendants' motions to dismiss the plaintiffs' state law and RICO claims for lack of subject matter jurisdiction are DENIED;

(2) the defendants' motions to dismiss the plaintiffs' cause of action under sec. 301 as barred by the statute of limitations are GRANTED; and

(3) Keystone's motion to dismiss Counts I and II of the plaintiffs Complaint for failure to state a claim upon which relief can be granted is DENIED.