# INTERNATIONAL ASSOCIATION OF MACHINISTS & AEROSPACE WORKERS, IAM

Local 437, IAM Local 710, IAM District 10, IAM District 172, individually and as authorized representatives of all IAM Employees of United States Can Company, Continental Can Company, CCC Series 200, Inc., Inter-American Packaging, Inc., and GP Acquisition Company, Inc., Plaintiffs-Appellants,

v.

# UNITED STATES CAN COMPANY, a Georgia

corporation, Continental Can Company, U.S.A., Inc., a Delaware corporation CCC Series 200, Inc., a Delaware corporation, Inter-American Packaging, Inc., a Pennsylvania corporation, GP Acquisition Company, Inc., a Pennsylvania corporation, and John Doe's 1–100, collectively referring to the banks, and other lenders participating in the financing of the acquisition of Continental Can, packaging sector by United States Can Company, Defendants-Respondents.

Supreme Court

*No. 87–1784. Argued March 28, 1989.—Decided June 27, 1989.*

(Also reported in 441 N.W.2d 710.)

479

For the plaintiffs-appellants there were briefs (in court of appeals) by *Richard D. Wilkinson, Stephen H. Skoller, Mary Jo Reich,* and *Lowenstein, Sandler, Kohl, Fisher & Boylan,* Roseland, New Jersey; and *David Leo Uelmen* and *Previant, Goldberg, Uelmen, Gratz, Miller & Brueggeman,* Milwaukee; and oral argument by *Mr. Wilkinson.*

For the defendant-respondent, Continental Can Company, U.S.A., Inc., there was a brief (in court of appeals) by *Robert A. Christensen, Stanley S. Jaspan,* and *Foley & Lardner,* Milwaukee, and oral argument by *Mr. Christensen.*

For the defendants-respondents, United States Can Company, CCC Series 200, Inc., Inter-American Packaging, Inc., and GP Acquisition Company, Inc., there was a brief (in court of appeals) by *Carson P. Veach,* and *Seyfarth, Shaw, Fairweather & Geraldson,* Chicago, Illinois; and *Robert H. Bichler* and *Thompson & Coates, Ltd.,* Racine; and oral argument by *Mr. Veach.*

HEFFERNAN, CHIEF JUSTICE. This is an appeal on certification of the court of appeals from a judgment of the circuit court for Racine county, which dismissed the complaint of the International Association of Machinists & Aerospace Workers (IAM), some of its local unions, and, in a represented capacity, all the IAM employees of those locals brought against United States Can Company and Continental Can Company. We reverse and remand for further proceedings.[1]

The issue certified to us by the court of appeals was stated as:

Whether an action under the Uniform Fraudulent Conveyance Act, ch. 242, Stats., is preempted by sec. 301 of the Labor Management Relations Act when brought by a union and employees against an employer.

---

[1] Also taken on certification was an appeal from an order which denied IAM's motion to set aside the original dismissal. Because we conclude that the complaint was improperly dismissed, we need not consider the subsequent motion and order separately appealed by IAM.

Our response to this certified question must be: No. We conclude that this particular action involves only state law. The action is not preempted by the Labor Management Relations Act (LMRA).

Because the facts determine the application of the law, we recite them in some detail. The United States Can Company in the spring of 1987 agreed to buy the general packaging division of Continental Can Company in a highly leveraged buyout which, it is alleged, would encumber the assets of the packaging division with a debt of sixty-five million dollars, *i.e.*, the purchasers would finance their acquisition primarily by the pledge to lenders of the assets being acquired.

The plaintiffs are the International Association, its local unions, and the union employees of the packaging division plants located in Racine, Wisconsin, and Danville, Illinois. We refer to the plaintiffs herein as "unions." The defendants are the United States Can Company, the acquiring corporation, the Continental Can Company, whose packaging division is being acquired, and an acquisition company which has been established apparently to manage takeovers such as this one. Also joined as defendants are the lending institutions which would finance the takeover. We refer to all of them as "companies."

The unions for some time, not specifically disclosed in the pleadings, have been the bargaining representatives of the employees and are parties to collective-bargaining agreements on behalf of the workers with the Continental Can Company.

Because the unions assert that the buyout will leave a financially impaired employer, they have brought an action under Wisconsin law, ch. 242, Stats., the Uniform

Fraudulent Conveyance Act (UFCA)[2] in a Wisconsin court to declare the transfer a fraudulent one under the provisions of the act and to enjoin the defendants "from selling, disposing, transferring or otherwise further conveying or encumbering any of the assets" that may be acquired by the transferee company. Other relief, including the appointment of a receiver to protect the employees and other creditors, is sought. No damages are asked for.

The essence of their complaint is that the terms of the buyout without fair consideration will leave the packaging division insolvent or inadequately capitalized, thus resulting in a constructive fraud on creditors under UFCA. Intentional fraud is also alleged.

The unions claim they are proper plaintiffs and have a creditor status by reason of Continental Can Company's obligations to them of $19,950,000 in matured or unmatured claims. While counsel at oral

---

[2] The unions asserted claims under secs. 242.04, 242.05, and 242.07, Stats., which provide:

**242.04  Contract producing insolvency, fraudulent.** Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

**242.05  Other specifications of legal fraud.** Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

**242.07  Fraud in fact.** Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and future creditors.

argument was unable to respond with precision to the components of this claimed obligation, the complaint makes clear that the genesis of the relationship is the employer-employee status, which is defined by one or more collective-bargaining agreements. It is asserted that the obligation of the employer consists of matured and unmatured claims for "wages, vacation pay, sick leave pay, life, health and accident insurance, pension contributions, and other employee benefits." The unions, as unions, separately assert that they are creditors of the employers for dues checkoffs.

After the complaint was served, the companies responded by moving to dismiss pursuant to sec. 802.06(3), Stats., on the ground that "this action is preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. sec. 185."[3]

The trial judge, in deciding this motion, appropriately accepted the facts alleged in the complaint as correct; and it is to these facts, recited above, to which the parties have resorted in discussing this litigation.

The circuit judge reasoned that whatever rights the unions had derived completely from their collective-bargaining agreements and, therefore, any action brought on that creditor status was preempted by the LMRA.[4]

---

[3] 29 U.S.C. sec. 185(a) provides:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

[4] We note that the circuit judge repeatedly typified preemption under LMRA as preemption of the state forum. Preemption, if required under sec. 301(a), is preemption of state law. The state forum may be utilized for the litigation of a sec. 301(a) action if

He said in his opinion from the bench that "The claim is founded directly on rights created by the collective bargaining agreement." He stated the "resolution of the dispute under 242 will require this Court to evaluate and interpret a collective bargaining agreement."

After reviewing various decisions of the United States Supreme Court, he concluded by stating:

> [A]pplying the rationale contained in the cases cited will require this Court to accept the federal dictate—the federal law dictate that a state court cannot step in and interpret and decide this case in this forum.

He stated he did not have "jurisdiction" to determine the dispute because it would require interpretation of the collective-bargaining agreements; and, therefore, the claim was dismissed.

The appeal by the unions from this order followed and was subsequently certified to this court.

It appears to us that the resolution of this case hinges on the proper characterization of the nature of the plaintiffs' claim. If the claim substantially implicates rights governed by sec. 301 under LMRA, federal law must be applied. If the claim is properly characterized as a state creditor's action to obtain the remedies afforded by UFCA and requires no substantial interpretation of the collective-bargaining agreement as provided by Wisconsin statutes to protect creditors, Wisconsin law is applicable.

---

appropriate federal law is applied. See *Charles Dowd Box Co., Inc. v. Courtney,* 368 U.S. 502 (1962), and *Teamsters Local v. Lucas Flour Co.,* 369 U.S. 95 (1962), both of which hold that a state forum has jurisdiction but incompatible principles of state law must give way to the principles of federal labor law.

The mine-run case subject to preemption "is a contract claim in which a party to the collective-bargaining agreement expressly asserts that a provision of the agreement has been violated." *Electrical Workers v. Hechler,* 481 U.S. 851, 857 (1987). The case before us does not have that simplistic characteristic.

We first note the posture of the claim that the unions are creditors as defined by UFCA. The unions make that assertion for their members and for themselves. Under the procedural posture of the case, all parties agree that the allegations of the complaint must be taken as true. Also, it should be noted that one of the principal defendants, United States Can Company, denies any information on which it could form a belief as to the creditor status of the plaintiffs. Continental Can Company, the erstwhile employer, denies that any of the plaintiffs are creditors except for *de minimis* sums. Both of the principal defendants contend that what is relevant is not just that plaintiffs are, or could be, creditors, but that in any event they are creditors only by reason of the preexisting collective-bargaining agreements.

Essentially, the argument of each side relies upon United States Supreme Court cases. The unions, while recognizing the preemption of federal law in contract disputes over collective-bargaining agreements, point to the exceptions that appear both explicitly and implicitly in United States Supreme Court decisions that demonstrate that not all controversies that arise between parties to a collective-bargaining agreement are sec. 301 cases preempted by federal law. They conclude this is not a sec. 301 case.

The companies adopt the general proposition that any claims that are founded on rights created by collective-bargaining agreements are preempted by federal labor law. They argue that whatever rights the unions

486

have as creditors arise out of collective-bargaining agreements.

The question of whether a claim exclusively involves state law or whether it implicates federal law and thus is subject to preemption is a matter of law. Accordingly, we need not give special deference to the determination of the trial judge. The controlling question of law is, however, not a simple one, and its answer is dependent upon federal law as stated by the United States Supreme Court and by other federal courts to the extent that they appear to speak definitively on this question of the preemptive effect of sec. 301. See *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 214 (1985).

The federal law is clear that, where there is a sec. 301 claim, federal substantive law (irrespective of the forum) must control. *Teamsters Local v. Lucas Flour Co.,* 369 U.S. 95, 103 (1962), rules out the application of incompatible state law and mandates that federal law must prevail in a sec. 301 case, stating:

> The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements.

Thus, *Lucas* makes it clear that individual contract terms must have consistent meanings and that only uniform federal law is likely to obtain that result.[5]

---

[5] In *Lucas,* the contract term under consideration was a compulsory-arbitration provision. The United States Supreme Court held that the Washington Supreme Court not only had jurisdiction of the sec. 301 claim, but also reached the correct ultimate result.

The 1985 case of *Allis-Chalmers,* reversing a judgment of this court, 116 Wis. 2d 559, 342 N.W.2d 699 (1984), is highly informative and emphasizes that not all disputes between parties to a collective-bargaining agreement are to be governed by federal law. The actual matter at issue—whether sec. 301 of the LMRA preempts the state court action for bad-faith delay in making disability-benefit payments—was, however, decided in favor of preemption contrary to the decision of this court.

*Allis-Chalmers* attempted to summarize some of the principles of sec. 301 preemption. Relying on *Lucas Flour, supra, Allis-Chalmers* stated that:

> [A] suit in state court alleging a violation of a provision of a labor contract must be brought under sec. 301 and be resolved by reference to federal law. A state rule that purports to define the meaning or scope of a term in a contract suit therefore is pre-empted by federal labor law. At 210.

It found that, because the collective-bargaining agreement itself must be interpreted in terms of "good faith," the state could not add the gloss of breach-of-a-state-tort-duty to the collective-bargaining contract and, therefore, there was preemption.

*Allis-Chalmers* went on to limit the possible scope of its rule by stating:

> Of course, not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by sec. 301 or other provisions of the federal labor law. At 211.

It further stated:

> Clearly sec. 301 does not grant the parties to a collective-bargaining agreement the ability to con-

488

tract for what is illegal under state law. In extending the preemptive effect of sec. 301 beyond suits for breach of contract, it would be inconsistent with congressional intent under that section to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract. At 212.

The *Allis-Chalmers* court also said, in effect, that rights conferred by state law that are nonnegotiable in a collective-bargaining agreement are not subject to preemption.

In respect to the dispute before it, the United States Supreme Court concluded that the duty of good faith was already an implicit condition of the collective-bargaining agreement. That agreement required insurance coverage by the employer, and hence the question of good faith was "tightly bound with questions of contract interpretation that must be left to federal law." At 216.

The court specifically declined in *Allis-Chalmers* to pass judgment "on whether an independent, nonnegotiable, state-imposed duty which does not create similar problems of contract interpretation would be pre-empted under similar circumstances." At 217, n. 11. As pointed out above, however, a collective-bargaining agreement cannot provide for terms illegal under general state law.

It summarized the tenor of its holding, stating:

> It is perhaps worth emphasizing the narrow focus of the conclusion we reach today. We pass no judgment on whether this suit also would have been pre-empted by other federal laws governing employment or benefit plans. Nor do we hold that every state-law suit asserting a right that relates in some way to a provision in a collective-bargaining agreement, or more generally to the parties to such an agreement, necessarily is pre-empted by sec. 301. The full scope of the pre-emptive effect of federal labor-

489

contract law remains to be fleshed out on a case-by-case basis. We do hold that when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a sec. 301 claim, see *Avco Corp. v. Aero Lodge 735,* 390 U.S. 557 (1968), or dismissed as preempted by federal labor-contract law. At 220.

We believe that *Allis-Chalmers* substantially "said it all" in respect to preemption principles applicable to sec. 301. Cases subsequent to *Allis-Chalmers* have, however, "fleshed out" the general principles set forth therein.

In *Electrical Workers v. Hechler,* 481 U.S. 851 (1987), the principles of *Allis-Chalmers* were applied without significant modification. There, the employee claimed that the union had breached its duty to provide her a safe workplace. The Supreme Court noted that, in the absence of an agreement, the duty would devolve upon the employer and, hence, the determination of whether the duty fell upon the union required the interpretation of the collective-bargaining agreement—a process, the Court said, that must yield to the application of uniform interpretations of the federal law. *Hechler* reiterated the rule of *Allis-Chalmers* that there was preemption when the resolution of a state claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract. *Hechler* at 859.

In the same court term as *Hechler,* the Supreme Court, in *Caterpillar Inc. v. Williams,* 482 U.S. 386 (1987), decided that, where employees had separate employment contracts and their rights were not dependent on the interpretation or application of the collective-bargaining contracts, the complaint for enforcement

did not require evaluation under sec. 301 and was not removable to federal court.

While *Caterpillar* is not controlling in the instant case, its language is instructive. The Court in *Caterpillar,* relying on *Allis-Chalmers,* stated:

> [A] plaintiff covered by a collective-bargaining agreement is permitted to assert legal rights *independent* of that agreement, including state-law contract rights, so long as the contract relied upon is *not* a collective-bargaining agreement. At 396.

In contrast, the Court pointed out that:

> Section 301 governs claims founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement.' At 394.

It could be asserted that *Caterpillar* expands the *Lucas Flour* test of preemption that arguably requires an express assertion that a collective-bargaining agreement has been violated, and supplants it with a test merely requiring that the claim be "founded directly on rights created by collective-bargaining agreements." At 394.

We are not persuaded that the test is different than that utilized in predecessor cases. The verbiage is slightly at variance, but the significance of that variance is not made apparent by the Court in *Caterpillar.* It is the facts there that constitute a significant variance.

That *Caterpillar* does not alter the previously stated rule is corroborated by the recent case of *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. —, 108 S. Ct. 1877 (1988). There, the majority relied on the pre-*Caterpillar* formula that preemption turns on whether the state-law claim can be resolved without interpreting the collective-bargaining agreement. Lingle traced the history of sec. 301 preemption from *Charles Dowd Box Co., supra,*

491

*Lucas Flour, supra,* and *Allis-Chalmers, supra,* and concluded that:

> [I]f the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are states) is pre-empted and federal labor-law principles—necessarily uniform throughout the nation—must be employed to resolve the dispute. At 1881.

Thus, it appears that the proper test is not esoteric, but practical—does the adjudication of the state-law claim depend on the interpretation of the collective-bargaining agreement?

Even so, recent precedent indicates that a court does not risk preemption merely because some aspects of the collective-bargaining agreement are examined in determining the state claim. In *Lingle* itself, the Court pointed out that a finding of parallelism of some provisions of the collective-bargaining agreement with facts necessary to resolve a state-law claim does not necessarily compel sec. 301 preemption.

An opinion of the court of appeals for the second circuit in *Baldracchi v. Pratt & Whitney Aircraft Div.,* 814 F.2d 102 (2nd Cir. 1987), was cited with approval in *Lingle,* at 1885. That case held the fact that the terms of the collective-bargaining agreement were relevant in furnishing the basis for making an appropriate award of damages to an employee asserting a state claim did not require a finding of preemption. It was held that Baldracchi's right not to be wrongfully discharged for filing a worker's compensation claim was not dependent upon the collective-bargaining agreement, although, clearly, the measure of her redress—the damages—was dependent upon wages established by that agreement. *Bal-*

*dracchi* referred to language in *Allis-Chalmers* that emphasized that "tangential" reference, or even dependence upon the terms of a collective-bargaining agreement for some purposes, did not impel a conclusion of preemption.

*Baldracchi* also seizes upon other points in the Supreme Court opinions referred to herein, *e.g.,* that some rights arising under state law are nonnegotiable (see *Allis-Chalmers* at 213 and 217 n. 11) and therefore cannot be inquired into by the federal law of labor contracts. *Baldracchi* points out that the right to file a worker's compensation claim is one of those rights. *Baldracchi* states that, if LMRA is interpreted to deny employees in a collective-bargaining unit a right to a state remedy enjoyed by employees who are not represented in collective-bargaining units, the policy of the federal labor act is turned "on its head." 814 F.2d at 107.

From these cases, we derive fairly simple principles that, as evidenced by divergent opinions of various federal cases, are not simple of application. We deem the basic and controlling principles to be these: A state court has concurrent jurisdiction over a sec. 301 claim, subject to removal to a federal court; but, in any forum, a sec. 301 claim is always subject to the application of federal labor law.

If the claim does not require substantial interpretation of a collective-bargaining agreement, the application of federal law is not required. In determining whether the claim is preempted by sec. 301, the Supreme Court has stated the following guidelines:

A suit brought in a state court directly alleging a violation of a labor contract must be brought under sec. 301 and resolved by reference to federal labor law. Where the particular dispute can only be resolved by interpreta-

tion of the collective-bargaining agreement, it is a claim under sec. 301 and is resolvable only by the federal labor law; however, there must be more than a "tangential" reliance upon the collective-bargaining agreement. The dispute in question or the issues for its resolution must be "tightly bound" to the interpretation of the collective-bargaining agreement. When resolution of the state claim is substantially dependent upon the analysis of terms in a collective-bargaining agreement, it must be treated as a sec. 301 claim or dismissed; or, under another formulation of the same rule, a state-law claim that is "founded" directly on the collective-bargaining agreement is a sec. 301 claim requiring resolution by federal labor law.

Having these "principles" in mind, we must determine their effect on the case before us. Using these principles, we reach the conclusion that this is not a sec. 301 case subject to preemption. It is an action brought to assert a state-law right to set aside what is alleged to be a fraudulent conveyance. Justice Stevens in footnote 12 of *Lingle,* at 1885—a unanimous decision—stressed that the collective-bargaining agreement might well be the predicate for determination of the extent or scope of the remedy to which a worker might be entitled under state law and, to the extent that the collective-bargaining agreement needed interpretation, federal law would govern that interpretation, but that use of federal law did not require preemption of the state claim.

In the instant case, the plaintiff unions stress that the terms of a collective-bargaining agreement need not be interpreted to give them the remedy sought under UFCA. They merely need be creditors—present or potential, contingent or matured—and no threshold amount is required. Whether their qualification as credi-

tors can be proved remains to be seen; but, under the posture of this case, where the assertion is that the plaintiffs are creditors, that pleaded fact must be assumed to be true.

*DeFord v. Soo Line Railroad Co.*, 867 F.2d 1080 (8th Cir. 1989), considered whether a Minnesota UFCA action challenging a leveraged buyout was preempted by the Railway Labor Act. The court relied upon the language of *Allis-Chalmers* and concluded that the Minnesota state UFCA claim was entirely dependent on rights afforded by the preexisting collective-bargaining agreement and was, therefore, preempted. Chief Judge Donald Lay, dissenting, relied upon footnote 12 in *Lingle,* referred to above, and stated:

> Interpretation of the collective bargaining agreement is required only to determine standing as a creditor, and to determine the amount of damages. The state statute creates an entitlement independent of the collective bargaining agreement, and is not preempted by the RLA. At 12.

We conclude that the analysis of Chief Judge Lay is the appropriate one under the guidelines of the Supreme Court itself. A creditor is defined by UFCA, sec. 242.01(3), Stats.: " 'Creditor' is a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent."

Creditors under UFCA include holders of unreduced tort claims *(Marcus v. Kane,* 18 F.2d 722 (2nd Cir. 1927)), and employees with claims against their employer for services rendered *(Pallott v. LaSalle Roofing & Shingle Co.,* 254 N.Y.S. 748 (1931)). Both actual and constructive fraud are addressed by the act. While sec. 242.07 deals with conveyances that involve actual intent to defraud, sec. 242.04 covers conveyances where

insolvency results, and sec. 242.05 covers conveyances that leave a business with unreasonably small capital. Fraudulent conveyances may be blocked or annulled as provided by secs. 242.09 and 242.10. Constructive fraud claims under UFCA must also deal with the issue of whether the conveyances were made for fair consideration. *In re Bossell, Van Vechten & Chapman,* 30 Wis. 2d 20, 30, 139 N.W.2d 639 (1966).

The companies emphasize that, under *Running v. Widdes,* 52 Wis. 2d 254, 190 N.W.2d 169 (1971), UFCA is a statute that confers no substantive rights, but rather confers remedies upon creditors with existing substantive rights. The assertion is true but irrelevant. We do not see the plaintiffs' complaint as asserting that UFCA gives them creditor status. Rather, the claim is that they are creditors under the collective-bargaining agreements and are seeking to have the same remedies that are afforded to other creditors.[6]

As stated under the somewhat different, but pertinent, circumstances of *Baldracchi, supra,* it would be strange to deny workers in collective-bargaining units the benefits of the remedies afforded all other creditors by UFCA just because they are organized laborers. The most significant aspect of *Running v. Widdes* is given no emphasis by the companies herein. The opinion stated

---

[6] As stated above, their assertion of creditor status under the procedural posture of this case is not subject to question. Even the answer of Continental Can acknowledges that the plaintiffs may be creditors, but the answer brushes aside the legal significance of that status as a *de minimis* one. We need not address the question of whether a claimant whose claim is small can be barred from a plaintiff's status in a creditor's action to set aside a fraudulent conveyance. Suffice it to say no legal basis for that distinction is argued, nor need it be, for under the pleadings here the plaintiffs are creditors.

that the policy of the law is to benefit creditors and to give them a remedy in the event of fraudulent transfers and, as a remedial statute, UFCA should be liberally construed "to accomplish its purpose of giving speedy relief against a fraudulent debtor." At 259.

We see no force in the argument that UFCA is inapplicable because it confers no substantive rights. It does not. It is not intended to. What plaintiffs seek by use of UFCA is not the substantive right of a claim as creditor, but a remedy to assist in the satisfaction of that substantive claim.

We note that the case of *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3rd Cir. 1986), validates the use of a state UFCA proceeding by a creditor to challenge a leveraged buyout. The United States of America was a creditor for income taxes in the *Tabor* case, where there was a conveyance of a major coal producer's assets and where the transaction jeopardized the ability of the United States to collect taxes. The court found it was appropriate to apply Pennsylvania's fraudulent conveyance act for the protection of creditors to set aside the leveraged buyout. Labor unions and their members should not be denied this same remedial aspect of state law unless to afford such remedy in some way impinges upon, or interferes with, the underlying and paramount philosophy of LMRA that the same federal legal standards be applied nationally to the interpretation and application of collective-bargaining agreements. In this case, there is no evidence of any impingement upon basic philosophies of LMRA.

We also consider other language appearing in several of the opinions of the United States Supreme Court that impels the conclusion we reach here.

It is rather obvious that, if the result sought to be achieved by the state claim or action cannot be the sub-

ject of any collective-bargaining agreement, it is non-negotiable. Hence, the assertion of such claim can have no effect on labor negotiations or on collective-bargaining agreements. See *Allis-Chalmers* at 211, 212. It would be difficult to assert that an agreement to submit to, or be victimized by, fraudulent conveyors is an agreement that could be negotiated legally under any system of law by parties to a collective-bargaining agreement. Certainly, the rights under UFCA are not rights that a party to this litigation contends may be bargained away. *Allis-Chalmers* at 212 noted that sec. 301 does not grant parties to a collective-bargaining agreement the ability to contract for what is illegal under the state law or to forego rights or obligations under state law that are independent of the labor contract. We do not see the defendant companies claiming that the right to assert the remedies of UFCA have been bargained away or can be bargained away in any collective-bargaining agreement. More to the point, the above language of *Allis-Chalmers* makes it clear that the right to use UFCA need not hinge upon any possible interpretation of a collective-bargaining agreement. *Allis-Chalmers,* at 217, made a significant point in asserting that parties to a labor contract are free to bargain in respect to what constitutes "good faith" in an insurance agreement. In effect, the Supreme Court concluded that, although "good faith" was a concept of state tort law, it was bargainable and negotiable in a collective-bargaining agreement because it involved terms and conditions in respect to the timeliness and methods of insurance benefit payments agreed upon in the collective-bargaining agreement.

It could be argued that a conveyance which is denominated as a constructive fraud only by reason of its consequences—such as undercapitalization or insolvency—could be an appropriate subject for labor negoti-

498

ations. Such fraud after all is only of a type that is presumed in law. The fraud alleged in the third count of the complaint of the unions is brought under the provisions of sec. 242.07, Stats., *Fraud in fact.* The allegation is one of intentional fraud. Such conduct is proscribed by law and cannot be negotiable. The purpose of a uniform federal labor law cannot be furthered by any ratiocination that actual fraud is an appropriate or negotiable subject of a collective-bargaining agreement.

The language of Judge Richard Posner in the recent case of *Air Line Pilots Assoc. International v. UAL Corporation, International Association of Machinists & Aerospace Workers,* Nos. 83-3308, 88-3377, and 88-3387 (7th Cir. 1989), is by analogy appropriate to the use, in this case, of UFCA to control alleged illegal aspects of a corporate takeover. The Seventh Circuit case involved the applicability of a Delaware anti-takeover law, which was invoked to avoid a hostile leveraged buyout. It was claimed that the law of the State of Delaware was preempted by the Railway Labor Act, an act that has been interpreted to have as much preemptive effect as sec. 301 actions under LMRA. The Seventh Circuit said the Delaware law was not preempted and stated that preemption would be contrary to public policy and that an anti-takeover clause in a collective-bargaining agreement was a nullity. Judge Posner wrote:

> Although preemption does not seem required to further the objectives of federal law, it could have a catastrophic effect on the efforts of states to regulate takeovers, and this consideration is germane since, realistically, a judgment about preemption requires a weighing of federal and state interests. *See, e.g., Local 926, International Union of Operating Engineers v. Jones,* 460 U.S. 669, 676 (1983); *Belknap, Inc. v. Kale, supra,* 463 U.S. at 498. Any firm that

had a collective bargaining agreement with a signifi-
cant fraction of its work force could adopt anti-take-
over measures with complete impunity, simply by
writing them into the collective bargaining agree-
ment. Unionized firms would be immune to hostile
takeovers if, as is common, [*24] the union feared
that a buyer of the company would seek to economize
on its labor costs by renegotiating the company's col-
lective bargaining agreements or even by selling off
the company's assets to purchasers who would take
free of any obligation under such agreements. For us
to create in the name of preemption so enormous a
loophole in state regulation, without any evidence
that the loophole is necessary to protect the objec-
tives of federal labor law, would be reckless. Like the
criminal law, the regulation of corporations is, as the
Supreme Court reminded us in the CTS case, a mat-
ter of primary state responsibility. See 107 S. Ct. at
1550–52; see also *Cort v. Ash*, 422 U.S. 66, 84–85
(1975). In such areas the presumption is against fed-
eral preemption. *California v. ABC American Corp.*,
57 U.S.L.W. 4425, 4427 (S. Ct. April 18, 1989). And
presumption or not, we do not think that the framers
of the Railway Labor Act meant to deal the body
blow to state regulation of corporations that a finding
of preemption in this case would administer. 1989
U.S. App. LEXIS 6521, 21.

In a vein similar to that of Judge Posner's opinion,
we have already explained that these claims require only
tangential reference to the collective-bargaining agree-
ment. No substantial interpretation is required. On the
other hand, we conclude that the rationale for the objec-
tion to UFCA in this case on the ground that it might
interfere with the federal labor law goal of uniformity is
hard to understand. It would appear that the suppression
of fraud, presumed or factual, even in the civil sense, is
so closely related to the criminal law that the state has a

substantial interest that should not be tampered with unless the paramount interest of the federal government in uniform labor law in the particular case is demonstrated.[7] It would appear that an area of state law such as that which we have under consideration here—fraudulent conveyances—is one in which the presumption should be against federal preemption.

In respect to the arguments of the defendants that the rights afforded by UFCA are remedial only, we respond by pointing out that the rights, because they are remedial, are significant ones in the panoply of most states' arsenals against those who would defraud creditors. A substantial state interest is at stake that should not be displaced upon a mere assertion that the uniformity of federal labor laws will be put in jeopardy. Defrauded creditors' rights should not be allowed to go unvindicated by merely asserting that the use of UFCA raises the spectre of non-uniform interpretations of collective-bargaining agreements. There is no showing of such a consequence here. Under the facts of this case, as well pleaded in the complaint, the unions and their members are creditors and are entitled to assert the remedy afforded by UFCA.

In conclusion, then, we hold that the cause of action asserted is a state claim, not a sec. 301 claim subject to preemption. There is no "substantial" dependency on a collective-bargaining agreement. The right claimed at the most requires only "tangential" reference to the col-

---

[7] We point out that we do not balance the importance, in terms of policy, of the state claim against the preemptive effect of federal law. As *Allis-Chalmers* at 214, n. 8, makes clear, balancing or weighing of the comparative importance of state law is irrelevant and inappropriate. Rather, we state that an important state value should not be discarded lightly unless there is preemption under the federal law.

lective-bargaining agreement. The rights arise under the state statute, not under any collective-bargaining agreement. There is no "intertwining." The state claim arises under an entirely separate aggregation of rights not even remotely concerned with labor law—state or federal. Nor are the rights being asserted in any way founded upon a substantial interpretation of a collective-bargaining agreement, nor, as we point out, could they be. The unions are not seeking directly to enforce their collectively-bargained rights to wages or other benefits. Rather, they seek to utilize UFCA to prevent their *debtor* from putting itself in a posture that may fundamentally compromise its ability to meet its obligations to its creditors; and there has been no showing by the companies that this claim will require substantial interpretation of the collective-bargaining agreement or that it will impinge upon the acknowledged value in having uniform federal labor law. There is simply no logical reason for this attempt to preempt an important area of state creditor law.

The only question of any real importance at this stage of the litigation is the unions' creditor status. Given the broad definition of "creditor" that appears in sec. 242.01(3),[8] it cannot be doubted that the plaintiffs here have the standing and the factual posture under the complaint to bring this state action.

While their status as creditors in fact may be challenged upon remand, whether that status arose as the result of obligations to them under the collective-bar-

---

[8] **242.01(3)** 'Creditor' is a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent.

gaining agreement is immaterial. It is the status that counts, not its origin. To determine whether the unions and their members are creditors, simpliciter, is a perfunctory exercise not dependent upon any substantial interpretation of collective-bargaining agreements. It is a determination that has no dependency upon the application of federal labor law.

Upon remand, additional issues will be posed: Whether the company has rendered itself insolvent by the transaction, whether it will be unreasonably undercapitalized, whether the consideration for the transfer was fair, and whether there was, as alleged, constructive and actual fraud perpetrated on the creditors. At the most, however, we anticipate that any references in future stages of this litigation to collective-bargaining agreements will be "tangential." The claim is not predicated or dependent upon any provision of the agreement. What the unions and their employees seek is an injunction to set aside or avert what is alleged to be a fraudulent transaction. While this may involve complicated arithmetical calculations and accounting procedures, we do not see a possibility that, for the purposes of the remedy sought to be afforded by ch. 242, Stats. (UFCA), the collective-bargaining agreement need be substantially considered. Federal preemption by the application of federal labor law under sec. 301 of LMRA is inappropriate. This is not a dispute that, in its present state-claim posture, implicates federal labor law.

*By the Court.*—Judgment reversed and cause remanded.

LOUIS J. CECI, J. (dissenting). I dissent. I would find that the unions' cause of action under the Uniform Fraudulent Conveyance Act, ch. 242, Stats. 1985–86, is preempted by sec. 301 of the Labor Management Rela-

tions Act (LMRA), 29 U.S.C. sec. 185, because resolution of the unions' cause of action before this court will require substantial interpretation of the collective bargaining agreement between the unions and Continental Can Company (Continental). I am at a loss to understand how the majority could conclude otherwise.

Section 301(a) of the LMRA, 29 U.S.C. sec. 185(a), provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

In *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 451 (1957), the United States Supreme Court held that sec. 301 not only provides federal court jurisdiction over controversies involving collective bargaining agreements but also "authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements." *See also Lingle v. Norge Division of Magic Chef, Inc.,* 108 S. Ct. 1877, 1880 (1988). The Court later concluded that state courts have concurrent jurisdiction over sec. 301 claims. *Charles Dowd Box Co., Inc. v. Courtney,* 368 U.S. 502 (1962). However, state as well as federal courts must apply federal law in deciding such claims. *Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 102 (1962); *Lingle,* 108 S. Ct. at 1880 n. 2.

In *Lucas Flour,* the Court was confronted with the issue of whether a collective bargaining agreement implicitly prohibited a strike that had been called by the union. The Washington Supreme Court had answered that question by applying state law rules of contract

504

interpretation. *Lucas Flour,* 369 U.S. at 102. The Court rejected that approach and held that sec. 301 mandated resort to federal rules of law in order to ensure uniform interpretation of collective bargaining agreements because "[t]he possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements." *Id.* at 103.

In *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 208 (1985), the Court considered the issue of whether sec. 301 of the LMRA preempted a state law tort action for bad-faith delay in making disability benefit payments due under a collective bargaining agreement. The Court held that "[t]he interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation." *Id.* at 211. Consequently, since reference to the collective bargaining agreement as to the manner in which a benefit claim would be handled would necessarily have been relevant to any allegation that the claim was handled in a dilatory manner, the Court held that sec. 301 preempted the application of the state law tort remedy. *Id.* at 218–19. The Court concluded by holding "that when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, *see Avco Corp. v. Aero Lodge 735,* 390 U.S. 557 (1968), or dismissed as pre-empted by federal labor-contract law." *Id.* at 220; *see also Lingle,* 108 S. Ct. at 1883–84 n. 10; *Caterpillar Inc. v. Williams,* 482 U.S. 386, 394 (1987).

505

Therefore, sec. 301 of the LMRA preempts state law claims which are founded directly on rights created by the collective bargaining agreements or which are substantially dependent upon analysis of a collective bargaining agreement. *Caterpillar,* 482 U.S. at 394; *International Brotherhood of Electrical Workers v. Hechler,* 481 U.S. 851, 859 n. 3 (1987); *Evans v. Einhorn,* 855 F.2d 1245, 1251 (7th Cir. 1988); *Ethridge v. Harbor House Restaurant,* 861 F.2d 1389, 1396 (9th Cir. 1988). If the resolution of a state law claim depends upon the meaning of a collective bargaining agreement, the application of state law is preempted. *Lingle,* 108 S. Ct. at 1881.

In the case before this court, the unions' complaint expressly sets out that the debts the unions are seeking to secure exist solely because of the collective bargaining agreement. Paragraphs 1 and 3 of the complaint state in part:

> 1. . . . Plaintiffs are creditors of defendants with respect to wages, employee benefits, pension and welfare benefits, collective bargaining dues 'check-offs', and other matured and unmatured claims, pursuant to the collective bargaining agreement between the IAM and the defendants . . ..
>
> . . .
>
> 3. The IAM employees of the defendants are creditors of defendants *under the terms of the IAM Continental collective bargaining agreement in the approximate amount of $19,950,000.* This indebtedness is comprised of matured as well as unmatured claims over the life of plaintiffs' current collective bargaining agreement for wages, vacation pay, sick leave pay, life, health and accident insurance, pension contributions, and other employee benefits, as well as claims asserted in various grievance and arbitration proceedings, *all owed to the employees pursuant to the collective bargaining agreement.*

(Emphasis added.) The unions' complaint also sets out the basis of its claims. Paragraphs 21, 25, and 27 of the complaint state:

> 21. As a result of defendant U.S. Can's acquisition of the Continental packaging sector pursuant to the merger transaction between the parties, defendants have made and will make conveyances and incur obligations which will render the surviving entity insolvent within the meaning of Section 4 of the Uniform Fraudulent Conveyance Act, Wis. Stat. § 242.04. These conveyances and obligations, as more fully set forth in paragraphs 11 through 17, *supra,* will render the merged entity insolvent in that the fair saleable value of the available, unencumbered post-merger assets will be far less than the amount that the post-merger enterprise will need to pay its probable liabilities or its existing debts as they become absolute and matured.
>
> . . .
>
> 25. The transaction which defendants have completed, or are about to complete, involves conveyances and obligations on the part of defendants which will leave the surviving merged entity severely and unreasonably undercapitalized within the meaning of § 5 of the Uniform Fraudulent Conveyance Act, Wis. Stat. § 242.05. The property remaining in the surviving entity's hands upon completion of the merger transaction will be so encumbered by pledges, liens, and security interests that the surviving entity will be left with effectively no working capital, but will have insurmountable debt.
>
> . . .
>
> 27. The conveyances and transfers which defendants have completed, or are about to complete, as part of the U.S. Can acquisition of the Continental packaging sector have been made to hinder, delay, or defraud plaintiffs, who are both present and future

507

creditors of defendants, within the meaning of Section 7 of the Uniform Fraudulent Conveyance Act, Wis. Stat. § 242.07.

Consequently, in order to determine whether U.S. Can's acquisition of Continental's packaging division pursuant to the merger transaction between the parties will render the surviving entity insolvent, a circuit court would have to determine, under sec. 242.04, Stats., whether the present fair salable value of Continental's assets is less than the amount that will be required to pay Continental's liability on its existing debts as they become absolute and matured. Furthermore, in order to determine whether U.S. Can's acquisition of Continental's packaging division pursuant to the merger transaction between the parties would leave the surviving entity severely and unreasonably undercapitalized under sec. 242.05 the court would have to determine whether the property remaining after the conveyance is an unreasonably small capital. Finally, in order to determine whether U.S. Can's acquisition of Continental's packaging division pursuant to the merger transaction between the parties was made to hinder, delay, or defraud the unions under sec. 242.07 the court would have to determine the companies' actual intent.

In order to resolve these issues, the court would have to balance Continental's assets against its liabilities. To determine Continental's liabilities, the court would have to interpret the terms of the collective bargaining agreement to determine if the unions' claim of $19,950,000 in matured and unmatured claims over the life of unions' current collective bargaining agreement for wages, vacation pay, sick leave pay, life, health and accident insurance, pension contributions, and other employee benefits as well as claims asserted in various grievance and arbitration proceedings is correct. Making

such a determination would *undoubtedly* force the court to construe the meaning and import of the numerous provisions of the collective bargaining agreement in light of the provisions and definitions of the Uniform Fraudulent Conveyance Act.[1] Such substantial interpretation of the collective bargaining agreement by a state court to determine rights under state law would result in precisely the outcome that the doctrine of preemption under sec. 301 is supposed to prevent.

> The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements. Because neither party could be certain of the rights which it had obtained or conceded, the

---

[1] I note that:

A collective-bargaining agreement may, of course, contain information such as rate of pay and other economic benefits that might be helpful in determining the damages to which a worker prevailing in a state law suit is entitled. See *Baldracchi v. Pratt & Whitney Aircraft Div., United Technologies Corp.,* 814 F.2d 102, 106 (2d Cir. 1987). Although federal law would govern the interpretation of the agreement to determine the proper damages, the underlying state law claim, not otherwise pre-empted, would stand. Thus, as a general proposition, a state law claim may depend for its resolution upon both the interpretation of a collective-bargaining agreement and a separate state law analysis that does not turn on the agreement. In such a case, federal law would govern the interpretation of the agreement, but the *separate* state law analysis would not be thereby pre-empted.

*Lingle,* 108 S. Ct. at 1885 n. 12 (emphasis added).

However, in the case before this court, the state law claim is not separate because liability, not just damages, is decided by reference to the collective bargaining agreement. The companies' liability under state law is decided by reference to the collective bargaining agreement. As a result, *Baldracchi* is not applicable to the situation before this court.

509

process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provisions in such a way as to contain the same meaning under two or more systems of law which might someday be invoked in enforcing the contract. Once the collective bargain was made, the possibility of conflicting substantive interpretation under competing legal systems would tend to stimulate and prolong disputes as to its interpretation.

*Lucas Flour,* 369 U.S. at 103–104.

In *Brown v. Keystone Consolidated Industries, Inc.,* 680 F. Supp. 1212, 1216 (N.D. Ill. 1988), the United States District Court was confronted with a situation similar to the one presently before this court. Keystone Consolidated Industries, Inc. (Keystone), in order to alleviate its fiscal woes, allegedly conspired with Frank L. Corral (Corral) to circumvent Keystone's Chicago Heights Steel Division's (CHS Division) collective bargaining agreement and its pension agreement with its employees by executing a sham transaction in which Keystone would sell its CHS Division to a purported "independent buyer" who in reality was Corral, CHS Division's vice president and general manager. In this manner, Keystone would allegedly continue to realize profits from the operation of the CHS Division business without being saddled with the obligations under its collective bargaining and pension agreements. *Id.*

The plaintiffs, thirty-five former employees of CHS Division, alleged in part that they were preexisting creditors of Keystone in that Keystone owed the plaintiffs substantial sums of money in the form of pension and retirement benefits and contractual obligations under their collective bargaining agreement. *Id.* at 1219. The plaintiffs further alleged that the conveyance of Key-

stone to CHS Acquisition, which was incorporated by Corral and represented as an "independent buyer," was a false and fraudulent conveyance entered into by those parties for the purpose of avoiding the claims of the plaintiffs. *Id.*

The district court held:

> This cause of action, like the claim for common law fraud, is preempted by both the LMRA and the NLRA. As the plaintiffs' allegations concede, they are only 'preexisting creditors' of Keystone to the extent that Keystone owes them monies under the terms of the CBA and Pension Agreement. Indeed, the Shutdown Agreement also directly addresses the plaintiffs' eligibility for these benefits. Thus, it would be necessary to analyze the terms of at least *three* labor agreements in order to resolve the plaintiffs' fraudulent conveyance claim. Obviously, then, this cause of action is preempted by sec. 301.

*Id.* at 1219 (emphasis in original).

In *Deford v. Soo Line R. Co.*, 867 F.2d 1080, 1081–82 (8th Cir. 1988), employees adversely affected by the sale of a portion of a railroad's rail lines and a labor association brought an action alleging common law creditors' rights violations and a Minnesota Uniform Fraudulent Transfer Act violation in state court. The employees attempted to avoid removal of their action to federal court by arguing that the Minnesota Fraudulent Transfer Act imposed duties and obligations on all creditors completely independent of any collective bargaining agreement. *Id.* at 1087.

The court of appeals found that the existence and extent of the creditors' rights asserted by the employees could be determined only by interpreting the collective bargaining agreements. *Id.* at 1086. The court noted that the employees, in their complaint, predicated their

511

claims upon entitlements to accrued but unpaid wages, vacation pay, life and health insurance, pension contributions, and severance benefits arising "pursuant to continuing labor contracts and employee protection agreements." *Id.* Therefore, the court concluded that the creditors' rights asserted by the employees directly involved the interpretation of collective bargaining agreements and were, therefore, preempted under the Railway Labor Act (RLA), 45 U.S.C. secs. 151–188 (1982). *Id.* at 1087.

Similarly, I would hold in the case before this court that the unions' cause of action under the Uniform Fraudulent Conveyance Act, ch. 242, Stats., is preempted by sec. 301 of the LMRA, 29 U.S.C. sec. 185, because resolution of the unions' cause of action before this court will require substantial interpretation of the collective bargaining agreement between the unions and Continental Can Company. The majority opinion is simply wrong when it asserts that "any references in future stages of this litigation to collective-bargaining agreements will be 'tangential.' " Majority opinion at 503.

For the above reasons, I respectfully dissent.

I am authorized to state that JUSTICE WILLIAM G. CALLOW and JUSTICE DONALD W. STEINMETZ join in this dissenting opinion.