Lloyd T. DANIELSEN, et al., Plaintiffs,

v.

BURNSIDE–OTT AVIATION TRAINING CENTER, INC., et al., Defendants.

Civ. A. No. 89–3142.

United States District Court, District of Columbia.

Aug. 28, 1990.

Charles Edward Raley, James Scott Phillips, Michael Robert Hatcher, Israel & Raley, Chartered, Washington, D.C., for plaintiffs.

Brooksley Burn, Richard S. Ewing, Joseph G. Poluka, Arnold & Porter, Richard McMillan, Jr., Rosemary M. Collyer, Scott L. Winkelman, Bryan K. Pollard, Crowell & Moring, Washington, D.C., William Fitzhugh Fox, Fox, Carpenter, O'Neill & Shannon, S.C., Milwaukee, Wis., David W. James, Wilkinson, Barker, Knauer & Quinn, Washington, D.C., for defendants.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This litigation arises out of alleged violations of the McNamara–O'Hara Service Contract Act, as amended, 41 U.S.C. § 351 *et seq.*, by several defense contractors during the performance of five United States Department of Navy ("Navy") service contracts. Plaintiffs Lloyd T. Danielsen, David W. King, and Jack Wagstaff[1] contend that defendants Burnside–Ott Aviation Training Center Inc.; UNC Support Services; UNC, Inc.; DynCorp; BOC of Miami, Inc. ("BOC of Miami"); William V. Ott; Robert C. Ott; Donald Burnside;[2] and Marjorie Burnside engaged in a scheme to defraud employees of the minimum wages and fringe benefits to which they were entitled in violation of the civil provisions of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. § 1961 *et seq.* Currently pending before the Court are defendants' motion to dismiss.

## I.  Background

Plaintiffs allege that they and other employees were underpaid for work performed on five Navy service contracts. Three of the contracts were for aircraft maintenance services on the Navy's TH–57 helicopter training squadrons based in Florida. The remaining two maintenance service contracts at issue were for the Navy's T–2 and T–34/44 aircraft training squadrons based throughout the southern United States. The seeds of the present dispute were sown in November, 1985 when plaintiffs David King and Lloyd Danielsen filed a complaint with the regional office of the United States Department of Labor's Wage and Hour Division ("Wage and Hour Division") concerning the performance of the Navy's three contracts for maintenance of its TH–57 helicopter aircraft.

Prior to 1981, the Navy performed its own maintenance services for its TH–57 helicopter aircraft and its T–2 and T–34/44 fixed wing aircraft. Complaint ¶ 21. On September 28, 1981, the Navy contracted out the maintenance services for its TH–57 helicopters to BOC of Miami[3] for a three year period. BOC of Miami continued to perform this contract, the first of three TH–57 contracts at issue, under option until December 1, 1984 (Contract No. N00612–81–C–8007, "B–O Contract # 1"). *Id.* ¶¶ 6, 28. From December 1, 1984, until December 1, 1985, the TH–57 contract was performed by the Dynalectron Corporation, now known as DynCorp (Contract No. N00612–84–C–8002, "DynCorp Contract # 1"). *Id.* ¶¶ 9, 61. On December 1, 1985, BOC of Miami was awarded the third TH–57 maintenance contract (Contract No. 68520–86–D–0101, "B–O Contract #2") through the competitive bidding process. *Id.* ¶¶ 6, 92. On October 31, 1986, BOC of Miami assigned B–O Contract # 2 to UNC–Burnside–Ott, which has continued to hold this contract though the present time.

The remaining two contracts at issue, for the maintenance of the Navy's T–2 and T–34/44 fixed wing aircraft, were awarded to Dynalectron, now known as DynCorp. The T–2 maintenance service contract was awarded to DynCorp on February 4, 1985 (Contract No. N68520–85–D–9053, "Dyn-Corp Contract # 2"). *Id.* ¶¶ 9, 68. The T–34/44 maintenance service contract was

---

**1.** Plaintiffs' Motion for an Order Certifying that the Action May Proceed as a Class Action is still pending.

**2.** Donald Burnside died on March 29, 1989.

**3.** Prior to October 31, 1986, BOC of Miami's corporate name was Burnside–Ott Aviation Training Center, Inc. William V. Ott, Robert C. Ott, Donald Burnside, and Marjorie Burnside were all officers, directors and shareholders of the corporation. On October 31, 1986, Burnside–Ott Aviation Center, Inc. was acquired by UNC and incorporated as a wholly owned subsidiary under the name "UNC–Burnside–Ott,

Inc." At the time UNC acquired UNC–Burnside–Ott, Inc., it received the assignment of existing government contracts and the right to use the name "Burnside–Ott Aviation Training Center, Inc." Thus, despite the transfer of names, BOC of Miami and UNC Burnside–Ott are separate entities. In January 1987, BOC of Miami, a Florida corporation, was apparently dissolved under Florida law. For the sake of clarity, this opinion will use "UNC–Burnside–Ott" to refer to Burnside–Ott Aviation, Inc. after it was acquired by UNC and "BOC of Miami" to refer to it prior to UNC's purchase.

awarded to DynCorp on September 22, 1985 (Contract No. N68520–85–D–0033, DynCorp Contract # 3). *Id.* ¶¶ 9, 112.

Because all five contracts are for the provision of services to the federal government, they are governed by the Service Contract Act ("the SCA" or "the Act"). Under the Act, Congress has delegated broad authority to the Department of Labor ("DOL") to determine the wages to be paid and fringe benefits to be furnished to all employees under government service contracts. DOL exercises this authority through the issuance of wage determinations and other wage-related decisions and has comprehensive powers to enforce those determinations. Under DOL regulations, when the performance of a contract requires the employment of a class of service employee not listed on the wage determination, the contractor must classify such employee "so as to provide a reasonable relationship (i.e. appropriate level of skill comparison) between such unlisted classifications and the classifications listed in the wage determination." 29 C.F.R. § 4.6(B)(2)(i). Such a "conformance action" is subject to the approval of the Administrator of the Wage and Hour Division.

### A. The TH–57 Contracts

As a result of plaintiffs' complaint concerning the TH–57 contracts,[4] DOL investigated the payment practices of the contractors on the TH–57 contract. Complaint ¶ 124. In December 1986, shortly after UNC–Burnside–Ott was assigned B–O Contract # 2, the Administrator of the Wage and Hour Division concluded that the SCA had been violated. *Id.* ¶ 144. In particular, the Administrator concluded that workers classified as "technicians" should be reclassified as "aircraft workers" and paid the correspondingly higher wage. *Id.; see also* Affidavit of William W. Gross, Acting Assistant Administrator, Office of Pro-

gram Operations for the Wage and Hour Division ("Gross Aff.") at ¶ 9, attached as Exhibit B, to Memorandum in Support of DynCorp's Motion to Dismiss or for Summary Judgment ("Dyn. Mem.").

The Navy requested review and reconsideration of the Administrator's determination on the grounds that the lower paid technician classification rather than the aircraft worker classification was the primary classification required on the contract. Gross Aff. ¶ 10. The Administrator rejected the Navy's position on December 4, 1987, and reaffirmed the earlier decision that the workers should be classified as aircraft workers. *Id.*

Subsequently, UNC–Burnside–Ott appealed the Administrator's decision to the Deputy Secretary of Labor ("Deputy Secretary") pursuant to 29 C.F.R. § 8.7(b). Gross Aff. ¶ 13. Plaintiffs King and Danielsen participated as interested parties, pursuant to DOL regulations, by submitting exhibits and statements in support of the Administrator's determination. *Id.; see also* 29 C.F.R. § 8.11. In January 1989, the Deputy Secretary affirmed the Administrator's decision and directed that back wages should be paid from December 1, 1985, the effective date of B–O Contract # 2.[5] Complaint ¶¶ 157–158. The Deputy Secretary's decision applied only to B–O Contract # 2, not the earlier TH–57 contracts. The respective liability of BOC Miami and DynCorp for violations of the SCA under B–O Contract # 1 and DynCorp Contract # 1 is still pending before DOL. *Id.* ¶¶ 159–160.

### B. The T–2 and T–34/44 Service Contracts

The background of the two service contracts for the Navy's T–2 and T–34/44 aircraft (DynCorp Contracts # 2 and # 3) is equally complex.[6] In accordance with its

---

**4.** Both plaintiffs King and Danielsen worked on B–O Contract # 1 and DynCorp Contract # 1, but not on B–O Contract # 2. Complaint ¶¶ 3, 4. Plaintiff Wagstaff worked on all three TH–57 contracts. *Id.* ¶ 5.

**5.** To date, UNC–Burnside–Ott has distributed approximately $960,000 to employees in under-

paid wages owed for the period from December 1985 to September 1987. Gross Aff. ¶ 16.

**6.** Although none of the named plaintiffs worked on DynCorp Contract # 2, plaintiff King did work on DynCorp Contract # 3 from the commencement of the contract until July, 1986. Complaint ¶¶ 3–5.

bid proposals, DynCorp submitted a conformance request upon award of each contract proposing rates for numerous classifications not contained on the wage determinations. Complaint ¶¶ 74, 119; Declaration Of James A. Mackin ("Mackin Decl.") at ¶¶ 8–10, attached as Exhibit A to Dyn. Mem. The two conformance requests were consolidated for consideration by the Administrator, who issued a final ruling on April 3, 1987. *See* Letter Dated April 3, 1987, attached as Exhibit D to Dyn. Mem.; Complaint ¶ 153; Mackin Decl. ¶ 11.

Once again, as with the TH–57 contracts, the primary dispute was the contractor's proposed use of workers classified as "technicians" to perform aircraft maintenance. While the Administrator accepted the classifications proposed by DynCorp, she also increased most of the proposed wage rates for the classifications and directed DynCorp to apply these conformed wage rates to the commencement date of the applicable contract. Mackin Dec. ¶ 11; Gross Aff. ¶ 19.

On May 28, 1987, DynCorp petitioned the Board of Service Contract Appeals for review of the Administrator's determination. Mackin Decl. ¶ 12. Subsequently, the Navy petitioned to intervene in Dyncorp's appeal in support of DynCorp's position that the Administrator's proposed rates were inappropriate. *Id.* ¶ 13. Although this appeal is still pending, it has been stayed while DOL, the Navy, and DynCorp engage in settlement discussions. Mackin Decl. ¶¶ 14–16. To date, settlement negotiations between the parties continue and the Deputy Secretary has not issued a final decision regarding DynCorp's appeal of the Administrator's determination.

## C. The Allegations of the Complaint

Plaintiffs commenced this action on November 17, 1989, together with a companion case against the government.[7] Plaintiffs allege that defendants were aware of the requirements of the SCA and the wage determinations to be incorporated into each of the five contracts but "knowingly and intentionally developed and used an employee classification system which did not conform to the labor classifications contained in the Wage Determinations issued by the Department of Labor." Complaint ¶¶ 31–32 (B–O Contract #1); *see also* ¶¶ 63–64 (DynCorp Contract #1); ¶¶ 69–70 (DynCorp Contract #2); ¶¶ 93–94 (B–O Contract #2); ¶ 115 (DynCorp Contract #3). Plaintiffs contend that defendants concealed the existence of DOL wage determinations from their employees for the express purpose of paying them less than the minimum wage. *Id.* ¶¶ 44, 71. Plaintiffs also contend that in furtherance of their scheme to defraud and underpay their employees, defendants sent various deceptive letters to the Navy, DOL, and their employees through the U.S. mail. *Id.* ¶¶ 36, 42, 66, 74, 76, 119, 122, 127, 131, 142, 147, 149, 151. In addition, plaintiffs allege that defendants altered signed documents in furtherance of this scheme. *Id.* ¶¶ 130–134.

Plaintiffs' Complaint consists of five counts. The first four counts assert claims against all defendants for various violations of RICO: (1) Count I asserts a claim under 18 U.S.C. § 1962(a); (2) Count II asserts a claim under 18 U.S.C. § 1962(b); (3) Count III asserts a claim under 18 U.S.C. § 1962(c); and (4) Count IV asserts a claim under 18 U.S.C. § 1962(d).[8] Count V of the Complaint asserts a claim against

---

7. In the companion case, *Danielsen v. Dole,* 713 F.Supp. 966 (D.D.C.), plaintiffs seek a writ of mandamus against the Secretary of Labor and the Secretary of the Navy compelling them to collect back wages against the same defense contractors for alleged SCA violations of the five contracts at issue in this case.

8. Section 1962(a) of RICO prohibits a person who has received "income derived ... from a pattern of racketeering activity" to "use or invest" such income in an "enterprise." 18 U.S.C.

§ 1962(a). Section 1962(b) of RICO makes it unlawful to "acquire or maintain" an "interest in or control of" an "enterprise" "through a pattern of racketeering activity." 18 U.S.C. § 1962(b). Section 1962(c) of RICO prohibits a person "employed by or associated with" an "enterprise" to "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Finally, § 1962(d) prohibits a conspiracy to violate § 1962(a), (b), or (c) of RICO. 18 U.S.C. § 1962(d).

all defendants for common law fraud. On Counts I–IV, plaintiffs seek damages equal to three times the amount of back pay, wages, and other benefits "defendants are compelled to pay ... under the Department of Labor's decisions and determinations arising out of DynCorp Contracts # 1, # 2, and # 3, and B–O Contracts # 1 and # 2." Complaint at 45. On Count V, plaintiffs seek damages equal to the difference between the wages and fringe benefits they were actually paid by the defendants under the five contracts and the wages and fringe benefits they would have received if the wage determinations incorporated into the contracts had been disclosed. Complaint at 46.

## II. Standard of Review

When presented with a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and its allegations must be taken as true. Moreover, any ambiguities or uncertainties concerning the sufficiency of the claims must be resolved in favor of the plaintiff. *See Hughes v. Rowe*, 449 U.S. 5, 10, 101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *see also* 5A Wright & Miller, Federal Practice and Procedure § 1357 (1969). The Supreme Court has stated:

> In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless

it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (footnote omitted). Defendants contend that this action must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted.[9]

## III. Discussion

Defendants have moved to dismiss plaintiffs' complaint on a number of grounds including that plaintiffs' RICO claims have been preempted by the SCA because the gravamen of those claims—that certain employees under service contracts with the Navy were underpaid—is within the exclusive jurisdiction of DOL. *See* Memorandum of Points and Authorities in Support of the UNC Defendants' Motion to Dismiss the Complaint ("UNC Mem.") at 8. Because the Court concludes that to permit plaintiffs to enforce the SCA through a RICO suit such as this would destroy the administrative scheme established by the SCA and negate the congressional intent to delegate such matters to DOL, it does not reach defendants' other grounds for dismissal.

### A. The Service Contract Act

In order to understand how RICO, a general statute, is preempted by the specific and comprehensive provisions of the SCA, some background concerning the SCA is

**9.** Both plaintiffs and defendants have filed affidavits and other documentary exhibits with the Court. To the extent that this Court relies on these additional filings in making its determination, defendants' motions will be treated as motions for summary judgment. *See* Fed.R.Civ.P. 12(b)(6) & 56. Rule 56 provides, "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In reviewing a motion for summary judgment, the court must consider the pleadings, related documents, and evidence in a light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Moreover, a factual dispute does not preclude summary judgment unless, the disputed fact is outcome determinative under the governing law. "It is thus axiomatic that even in the face of some factual disputes, 'where the *undisputed facts* demonstrate that one party is entitled to judgment as a matter of law, summary judgment in favor of that party is entirely appropriate.'" *Egger v. Phillips*, 710 F.2d 292, 296–297 (7th Cir.), *cert. denied*, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983) (citations omitted) (emphasis original).

necessary. The purpose of the SCA was to ensure that service employees working on government contracts are not paid wages below the prevailing wages being paid in the locality by non-government contractors. Thus, § 2 of the Act requires the inclusion of specific provisions establishing minimum wage and fringe benefit levels in contracts entered into by the United States in excess of $2,500 "the principal purpose of which is to furnish services in the United States through the use of service employees." 41 U.S.C. § 351(a). This wage and fringe benefit determination is explicitly directed to the responsibility of the Secretary of Labor "in accordance with prevailing rates for such employees in the locality ..." 41 U.S.C. § 351(a)(1).

Thus, as plaintiffs themselves concede, "DOL has the exclusive authority to issue wage determinations and has the primary jurisdiction to enforce violations of its wage determinations." Representative Plaintiffs' Opposition to Motion of the UNC Defendants to Dismiss the Complaint ("Pl. UNC Opp.") at 17. The Act specifies that the "Secretary, or his authorized representative" is to determine the wage rates to be paid and fringe benefits to be furnished to service employees, 41 U.S.C. § 351(a)(1)–(2), and grants DOL authority "to enforce [the Act], make rules, regulations, issue orders, hold hearings, and make decisions based upon findings of fact, and take other appropriate action," 41 U.S.C. § 353(a).[10] The SCA also confers a comprehensive range of enforcement powers on DOL. For example, DOL may direct a federal agency to withhold funds from any contractor that it believes is not paying the correct wage. *Id.* § 352(a). In addition, if the funds withheld are not adequate, the SCA empowers DOL to sue a contractor for recovery of underpayment of wages. *Id.* § 354(b). Finally, under certain circumstances, DOL can debar a contractor from

government contracting for three years. *Id.*

Furthermore, it is well-established that the SCA does not confer a private right of action, but rather provides for exclusive administrative enforcement with the Secretary of Labor. *District Lodge No. 166, Int'l Assoc. of Machinists and Aerospace Workers, AFL–CIO v. TWA Services, Inc.,* 731 F.2d 711, 716 (11th Cir.1984), *cert. denied,* 469 U.S. 1209, 105 S.Ct. 1175, 84 L.Ed.2d 324 (1985); *Miscellaneous Service Workers, Etc. v. Philco–Ford Corp.,* 661 F.2d 776, 779 (9th Cir.1981); *Int'l Assoc. of Machinists and Aerospace Workers v. Hodgson,* 515 F.2d 373 (D.C.Cir.1975); *Foster v. Parker Transfer Co.,* 528 F.Supp. 906, 907 (W.D.Pa.1981); *Nichols v. Mower's News Service, Inc.,* 492 F.Supp. 258 (D.Vt.1980). Indeed, as the Ninth Circuit has noted:

> ... it is apparent that nothing supports an inference of a legislative intent to create private remedies under the Act. Plaintiffs confuse an intention to confer rights—which Congress does repeatedly through legislation—with the specification of remedies for the protection of those rights. The plain language of the statute, as well as the legislative history, supports a contrary view; namely, that *Congress intended to provide for exclusive administrative enforcement of the [Act]."*

*Miscellaneous Serv. Workers v. Philco–Ford Corp., supra* at 780 (emphasis added).

Although employees under government service contracts do not have a private right of action to enforce the SCA, they do have administrative remedies. Indeed, plaintiffs King and Danielsen have exercised their remedies with respect to B–O Contract # 2. Plaintiffs filed the complaint that initiated DOL's investigation of wage

---

**10.** Moreover, under § 353(b):

[t]he Secretary may provide such reasonable limitations and may make such rules and regulations allowing reasonable variations, tolerances, and exemptions to and from any or all provisions of this chapter (other than section 358 of this title), but only in special circumstances where he determines that such limitation, variation, tolerance or exemption is necessary and proper in the public interest or to avoid the serious impairment of government business, and is in accord with the remedial purpose of this chapter to protect prevailing labor standards.

41 U.S.C. § 353(b).

determinations under B–O Contract # 2 and participated as interested parties pursuant to 29 C.F.R. § 8.11 in the Deputy Secretary's review of the Administrator's conformance decisions. DOL's investigation of the remaining two TH–57 contracts is ongoing. With respect to DynCorp's T–34/44 and T–2 contracts, though plaintiffs have no right to participate fully in the administrative proceedings and settlement negotiations, should a settlement be achieved, any new conformance ruling will be subject to appeal "by any aggrieved party" to the Deputy Secretary pursuant to 29 C.F.R. § 8.7(b). Thus, if plaintiffs are dissatisfied with any amended conformance ruling that might be issued as the result of ongoing settlement negotiations, they would have a right to seek review before the Deputy Secretary.

### B. RICO Preemption

It is axiomatic that, unless there is a "clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Morton v. Mancari,* 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974). The "balance, completeness, and structural integrity" of a statute that "provides for a careful blend of administrative and judicial enforcement powers" indicate that Congress intended it to preempt other more general statutes. *Brown v. GSA,* 425 U.S. 820, 832–33, 96 S.Ct. 1961, 1968, 48 L.Ed.2d 402 (1976).

Based on these principles, courts have held that RICO is preempted by a variety of statutes that establish comprehensive administrative schemes. *See e.g., Norman v. Niagara Mohawk Power Corp.,* 873 F.2d 634, 637–638 (2d Cir.1989) (RICO action dismissed where Energy Reorganization Act provided exclusive remedy for aggrieved plaintiff-employees); *Bodimetric Health Servs., Inc. v. Aetna Life & Casualty,* 903 F.2d 480, 486–87 (7th Cir.1990) (plaintiffs' RICO claims preempted by administrative benefits determination procedure under Social Security Act); *Brown v. Keystone Consol. Indus., Inc.,* 680 F.Supp. 1212 (N.D.Ill.1988) [hereinafter "Brown"] (RICO claims preempted by Labor Management Relations Act and National Labor Relations Act); *Butchers' Union, Local No. 498 v. SDC Inv., Inc.,* 631 F.Supp. 1001 (E.D.Cal. 1986) [hereinafter "Butchers' Union"] (RICO claims based on violations of mail and wire fraud statutes preempted by National Labor Relations Act).

In particular, courts have refused to apply RICO where a comprehensive administrative scheme exists to remedy violations of federal labor law. In *Brown, supra,* for example, the plaintiffs contended that the defendants "fraudulently deprived them of their employment benefits" and sought damages under RICO. 680 F.Supp. at 1224. The court held that plaintiffs' RICO claims were preempted by the Labor Management Relations Act ("LMRA") and the National Labor Relations Act ("NLRA") because "the underlying conduct is wrongful only by virtue of the labor laws." *Id.* at 1226. Similarly, in *Butchers' Union, supra,* the court held that plaintiffs' RICO claims based on violations of the mail and wire fraud were preempted because *"but for* the proscriptions of the labor law, defendants' conduct simply would not be either mail or wire fraud.... Bluntly put, no matter how you cut the complaint, the only conceivable 'fraud' is the deprivation of plaintiff's rights under the labor law." 631 F.Supp. at 1011.

The instant case poses the same situation. Here, the fraudulent scheme alleged by the plaintiffs is an underpayment of wages and fringe benefits due them pursuant to the SCA. Plaintiffs' RICO claims are all premised on alleged violations of the SCA. However, the SCA expressly assigns the responsibility for determining and enforcing wage levels and other employee benefits to DOL. Allowing plaintiffs to proceed with their RICO claims would not only upset the careful blend of administrative and judicial powers that Congress has created under the SCA, but also overturn well-established precedent that employees have no private right of action under the Act.

Thus, in *Foster v. Parker Transfer Co.,* 528 F.Supp. 906 (W.D.Pa.1981), the Court dismissed a breach of contract action

brought by service employees against their employer seeking damages for lost wages and fringe benefits" that they claimed were owed under the SCA. *Id.* at 906. The court, while recognizing that plaintiffs had fashioned their case as a diversity action, found that the gravamen of their complaint was that plaintiffs "were not paid by the defendant in accordance with the schedules promulgated under" the SCA. *Id.* Stripped to its core, that is precisely what the complaint in the instant case alleges. As the *Foster* court concluded, while such a complaint "may serve as the basis for administrative proceedings by the Secretary of Labor," it cannot enable plaintiffs to bypass such proceedings and seek relief in federal court. *Id.* at 907.

Nor is the Court persuaded by plaintiffs' arguments that defendants are using the SCA to "immunize" themselves "from all other liability, whether it be tort, contract, or other statutory liability." Pl. UNC. Opp. at 10. Plaintiffs' reliance on *Berry v. Andrews*, 535 F.Supp. 1317, 1318 (M.D.Ala. 1982), is simply misplaced. In *Berry*, the court held that a plaintiff's claim for retaliatory discharge under the Fair Labor Standards Act ("FLSA") was not preempted by the SCA. The court agreed that "an employee's sole remedy under the SCA for underpaid wage and lost fringe benefits is the administrative channel created by Congress," but held that a "plaintiff is entitled to pursue private action for an alleged retaliatory discharge under the FLSA since Congress did not provide any administrative redress for retaliatory discharge or attempt to address a suitable remedy in the SCA." *Id.* at 1319. Thus, the very rationale of the *Berry* Court belies plaintiffs' arguments. Unlike the situation in *Berry*, here plaintiffs seek redress for underpaid wages and fringe benefits, claims that are clearly addressed by the SCA.

If RICO were applicable to plaintiffs' claims, then a federal jury would be forced to decide issues that Congress has clearly delegated to the expertise of DOL. For example, plaintiffs allege that DynCorp engaged in "schemes to deny the class members the minimum wage payments determined and required by the Secretary of Labor pursuant to the Service Contract Act." Complaint ¶ 17. Yet, the Secretary of Labor has not yet determined the minimum wages required under the SCA for DynCorp Contracts # 2 and # 3 because there has been no final wage determination. Although the Department has issued a wage determination, it is currently on appeal to the Deputy Secretary of Labor. Similarly, as plaintiffs themselves recognize, Complaint ¶¶ 159–160, DOL has not made any final determinations with respect to B–O Contracts # 1 and # 2. Thus, plaintiffs would ask a jury to determine that defendants had underpaid their workers in violation of the SCA and that such underpayments constitute violations of RICO while DOL, charged with enforcing the SCA, has yet to determine the amount of underpayment, if any.

Finally, the relief that plaintiffs seek is that which is afforded by the SCA, only trebled. Plaintiffs seek the amount of back pay, wages and other benefits defendants would be compelled to pay as a result of alleged violations of the SCA. In order to award damages, the jury would in effect have to engage in a wage determination and retroactively reset any previous wage determinations established by DOL. Clearly, such wage determinations, which involve determining the prevailing wage in the private sector of a given locality for similar work, require the administrative expertise of DOL.

Adoption of plaintiffs' arguments would, in effect, allow a private right of action under the SCA with a treble damage remedy. Because the Court concludes that plaintiffs' RICO claims are inextricably intertwined with wage determinations under the SCA and that Congress intended to confine such claims to the administrative process, Counts I–IV of plaintiffs' complaint must be dismissed for failure to state a claim upon which relief can be granted.

With respect to plaintiffs' claim for common law fraud, Count V of the Complaint, the Court has discretion to hear this claim under the doctrine of pendent jurisdiction. *See United Mine Workers v. Gibbs*, 383

U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). As the Supreme Court has held, however, "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right ... if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Gibbs, supra* at 726, 86 S.Ct. at 1139 (citations omitted). In the instant case, although defendants urge that plaintiffs' fraud claim should be preempted as well, the Court will instead decline to exercise its discretion to allow plaintiff's fraud claim to proceed under the doctrine of pendent jurisdiction. *See e.g., Long Distance Services v. Telecommunications Corp.*, 692 F.Supp. 1402, 1406 (D.D.C.1988). The parties will not suffer undue hardship by dismissing the case from federal court at this early stage in the proceedings. Accordingly, Count V of the complaint will be dismissed for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1).